UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————————X

RICARDO BRENES,

          Plaintiff,

        -against-

CITY OF NEW YORK, BOARD OF EDUCATION
OF THE CITY OF NEW YORK, RUDOLPH F. CREW,
Schools' Chancellor, STEPHANIE D'AMORE
FERRANDINO, Principal, Martin Luther King High
School, STANLEY TURETSKY, Principal, Graphic
Communications Arts High School, JERRY STOOPACK,
Principal, Seward Park High School, JOANNE FRANK,
Principal, Norman Thomas High School, GRANGER
B. WARD, Manhattan Superintendent, JOHN
FERRANDINO, Director, Division of High Schools,
MARIA EMANUELSON, Head of Personnel in
Superintendent's Office, and EDWARD F. STANCIK,
Commission of Special Investigations, all of the above
being sued individually and in their capacity as
employees of the City of New York and/or
the Board of Education of the City of New York,

          Defendants.

———————————————————————————X

**OPINION & ORDER**
**CV-01-3943(SJF)(LB)**

FEUERSTEIN, J.

      On June 8, 2001, plaintiff Ricardo Brenes (plaintiff) commenced this civil rights action

pursuant to 42 U.S.C. § 1983 against defendants City of New York; Board of Education of the

City of New York; Rudolph F. Crew, Schools' Chancellor; Stephanie D'Amore Ferrandino,

Principal, Martin Luther King High School; Stanley Turetsky, Principal, Graphic

Communications Arts High School; Jerry Stoopack, Principal, Seward Park High School; Joanne

Frank, Principal, Norman Thomas High School; Granger B. Ward, Manhattan Superintendent;

1

John Ferrandino, Director, Division of High Schools; Maria Emanuelson, Head of Personnel in Superintendent's Office; and Edward F. Stancik, Commission of Special Investigations, all sued individually and in their capacity as employees of the City of New York and/or the Board of Education of the City of New York (collectively, defendants), alleging violations of his First Amendment free speech rights. Defendants now move pursuant to Rule 56 of the Federal Rules of Civil Procedure (Rule 56) for summary judgment dismissing plaintiff's complaint and plaintiff cross-moves pursuant to Rule 56 for summary judgment. In addition, plaintiff separately moves for my recusal from this action. For the reasons stated herein, defendants' motion is granted, plaintiff's cross motion is denied and plaintiff's motion for recusal is denied.

## I.    BACKGROUND

### A.    Factual Background[1]

#### 1.    Plaintiff's Position at the Martin Luther King Jr. High School

As of April 1993, plaintiff held several teaching certificates, including licenses to teach bilingual social studies Spanish DHS (Day High School) and bilingual social studies Spanish JHS [Junior High School]. (Declaration of Christine J. Kicinski (Kicinski Decl.), ¶ 4). On September 10, 1993, the New York City Department of Education (DOE) issued to plaintiff a Preparatory Provisional Teacher Certificate for bilingual social studies, dated September 7, 1993, and assigned him to a regular substitute position at Martin Luther King Jr., High School

---

[1] The facts are derived from defendants' statement of material facts pursuant to Local Rule 56.1 and the accompanying declarations and other evidentiary material filed in support of defendants' motion for summary judgment, as well as plaintiff's response to defendants' statement and counterstatement of disputed material facts and the accompanying declarations and evidentiary material filed in response to the motion and in support of the cross motion.

(MLKHS), where he remained until September 1996. (Kicinski Decl., ¶ 6A).

On or about September 29, 1994, plaintiff was selected as dean of MLKHS. (Letter from Stephanie Ferrandino [Principal Ferrandino] to Plaintiff dated September 29, 1994, Declaration of Isaac Klepfish [Klepfish Decl.], Exhibit [Ex.] E). The duties and responsibilities of a dean at MLKHS include oversight for students' behavior, educational adjustment, absences, lateness, and discipline. (Dean Duties and Responsibilities, Klepfish Ex. F)[2]. Indeed, at his deposition, plaintiff testified that his duties as dean included dealing with students' attendance and ensuring compliance with the school safety and security regulations. (Excerpts of Transcript of the Deposition Testimony of Plaintiff, Klepfish Ex. A, pp. 32-33, 58)[3]. As a result of his duties as dean, plaintiff was provided access to all of the students' attendance records at MLKHS. (Klepfish, Ex. A, p. 37, 40). In order to allow for the duties and responsibilities of a dean, a teacher selected for the position is relieved from three (3) subject classes and any official class or building assignment. (Klepfish Decl., Ex. E).

During his tenure as dean at MLKHS, plaintiff informed certain of the parents of students at MLKHS that their children were not attending classes. (Klepfish Ex. A, pp. 58-59, 67). According to plaintiff, he was mistreated as a result of his informing the parents that their children were skipping classes. (Id. at 59).

On or about May 26, 1995, plaintiff was told that he would no longer be acting as dean

---

[2] Although plaintiff disputes this contention on the basis that there are two exhibit F's annexed to the Klepfish Declaration, it is clear that the other Exhibit F does not pertain to this case and was erroneously included in defendants' exhibits on the motion.

[3] In addition, plaintiff testified that his duties included those identified in Klepfish Ex. F. (Klepfish Ex. A, p. 33, ¶¶ 7-25).

and that, effective May 30, 1995, he was to report to Dr. Burke's office during his previously

scheduled dean's assignments. (Letter from Principal Ferrandino to plaintiff dated May 30,

1995, Klepfish, Ex. G). Plaintiff remained at MLKHS, as a teacher, until September 1996.

(Kicinski Decl., ¶ 6A).

Beginning in June 1995, plaintiff reported the attendance issues at MLKHS to the

chancellor, special investigator and superintendent. (Klepfish Ex. A, p. 67; see, e.g. Plaintiff's

Letter to Crew dated January 5, 1996 and Plaintiff's letter to Ward dated September 18, 1996,

Plaintiff's Supplemental Exhibits [Supp. Ex.], Exs. XLIV and LII, respectively).

a.    Administrative Proceedings

On or about July 12, 1995, plaintiff filed a charge of employment discrimination against

the Board of Education of the City of New York (BOE) and MLKHS with the New York State

Division of Human Rights (NYSDHR), alleging violations of the Human Rights Law of the State

of New York, Article 15 of New York Executive Law. (Klepfish Ex. H). Specifically, plaintiff

alleged that he was subjected to racial discrimination–he is Hispanic– insofar as (1) he was the

only dean assigned a mentor; (2) he was told not to speak Spanish to the students; (3) the senior

dean was told not to assist him; (4) on May 30, 1995, he was demoted from the position of dean

to the position of bilingual social studies teacher; and (5) he had been accused of numerous

fabricated incidents. (Id.).

On or about July 20, 1995, plaintiff filed a dual charge of employment discrimination

against the BOE, MLKHS and Principal Ferrandino with the Equal Employment Opportunity

Commission (EEOC), alleging violations of Title VII of the Civil Rights Act of 1964. (Klepfish,

Ex. I).

By determination and order dated April 26, 2000, the NYSDHR found, after

investigation, no probable cause to believe that the BOE had engaged in the discriminatory

practice alleged. (Klepfish, Ex. J). Specifically, the NYSDHR found, as follows:

> The investigation of this instant complaint did not uncover sufficient evidence to
> support the allegations of discrimination. The record supports that [plaintiff] was
> mentored by three experienced Deans and was counseled by the Assistant
> Principal, yet he never improved. All three Deans reported that [plaintiff] would
> not follow anything that was suggested by them.
>
> The record showed that the individual who shared an office with [plaintiff] wrote
> to the Assistant Principal and informed her that [plaintiff] was not doing his job
> properly and was not treating the parents and students with respect. * * *
>
> The record also does not support that [the BOE] failed to keep [plaintiff] in his
> position as Dean because of his race (national origin). The investigation revealed
> that the [BOE] was not satisfied with [plaintiff's] performance as Dean and he
> was informed of this on more than one occasion. The record shows that
> [plaintiff's] replacement was also Hispanic. * * *
>
> The investigation did not reveal that the [BOE's] stated reasons for its action was
> a subterfuge to discriminate against [plaintiff] based on his Race (National
> Origin). The [BOE] advanced a non-discriminatory business related reason for its
> action.

(Id.). Accordingly, the NYSDHR dismissed the administrative complaint. (Id.).

By Dismissal and Notice of Rights dated June 29, 2000, the EEOC adopted the findings

of the NYSDHR and dismissed plaintiff's complaint. (Klepfish, Ex. K).


2.    Plaintiff's Positions after MLKHS

According to defendants, plaintiff was employed as a regular substitute teacher at the

High School of Graphic Communications Arts (HSGCA) from September 10, 1996 until

September 10, 1997. (Kicinski Decl., ¶ 6B).

The DOE had issued plaintiff a Certificate of Qualification (COQ), effective February 1, 1997, as evidence that plaintiff was eligible for a provisional certificate in social studies, grades seven through twelve, for a period of five (5) years from the effective date thereof. (Plf. Ex. X).

On or about July 2, 1997, the DOE issued plaintiff a New York City Public Schools conditional license in bilingual social studies in Day High Schools, effective July 1, 1997 and expiring January 31, 2002. (Klepfish, Ex. L).

By letter dated August 25, 1997, defendant Stanley Turetsky (Turetsky), Principal of HSGCA released plaintiff from his assignment as a bilingual social studies teacher at that school (Plf. Ex. XI). By letter dated September 3, 1997 to Ward, plaintiff, *inter alia*, requested a change from his position at HSGCA. (Supp. Ex. LVI).

According to defendants, from September 11, 1997 to February 1, 1998, plaintiff was employed as a regular substitute teacher at Seward Park High School (SPHS). (Kicinski Decl. ¶ 6C).

On or about December 21, 1997, the New York Post published an article alleging that Springfield Gardens High School in Queens, SPHS and MLKHS were "falsifying attendance records * * * in a scheme to siphon off crucial education dollars." Maria Alvarez and Susan Edelman, Our Schools in Crisis, N.Y. Post, Dec. 21, 1997. (See Klepfish, Ex. M). The article specifically named plaintiff as one of the purported "whistle-blowing" employees who notified DOE Commissioner Richard Mills about one thousand (1,000) "no-show students" at MLKHS and noted that plaintiff was demoted from his position as dean at MLKHS and transferred as a result of his whistle-blowing. Id. The article quoted plaintiff as saying that "MLK[HS] officials

6

disregarded the findings and chastised me for speaking out" and displayed a picture of plaintiff outside MLKHS. Id.

The day following the article, defendant Jerry Stoopack (Stoopack), the Principal of SPHS, requested that plaintiff report to his office "[i]n an attempt to resolve and clarify the attendance situation to which [plaintiff] referred" in the article. (Plaintiff's Exhibits [Pltf. Ex.], Ex. iv).

On or about January 20, 1998, Jayne Godlewski, the Assistant Principal at SPHS, sent plaintiff a letter indicating, in relevant part, as follows:

> "The Agreement between the Board of Education and the UFT [United Federation of Teachers] requires me to inform all non-appointed staff of the possibility that we may be unable to offer you a position for the spring, 1998 semester. Once we receive our allocation for the spring term and evaluate student program requirements, we will make a final determination. This will be done at the earliest possible moment, at which time you will be apprised of your status."

(Plf. Ex. v).

Sometime prior to February 2, 1998, plaintiff filed a grievance alleging that he was improperly excessed in violation of the collective bargaining agreement. (Supp. Ex. XLI). By decision dated February 2, 1998, Stoopack denied plaintiff's grievance, finding that plaintiff was not excessed in violation of the collective bargaining agreement. (Id.).

In February 1998, when a vacancy opened for a bilingual social studies Spanish teacher, plaintiff was appointed as a probationary teacher to Norman Thomas High School (NTHS). (Kicinski Decl., ¶ 6D; Transcript of Deposition Testimony of Joanne Frank [Frank Dep.], Klepfish Ex. B, p. 13; Plf. Ex. XV). In 1998 and 1999, defendant Joanne Frank (Frank) was the principal at NTHS. (Frank Dep., p. 9). On February 3, 1998, Frank noted on the Personnel

Transaction Form appointing plaintiff to NTHS that she rejected plaintiff's appointment because he had "indicated that unless he was guaranteed an appointment he was not available for assignment to [NTHS]" and that no such vacancy existed because "[t]he slot [plaintiff] was filling [had] been temporarily created by the reassignment of the teacher to another position [and] [t]hat teacher [had] the right of return in September." (Plf. Ex. XV). A written response on the form advised Frank that plaintiff remained at NTHS as an appointed teacher but "if he is excessed in June, so be it." (Id.).

According to Frank, she would not know about the disciplinary record of a teacher entering her school and she did not discuss plaintiff with the Human Resources liaison, defendant Maria Emanuelson (Emanuelson), before he appeared at NTHS. (Id., pp. 16, 39).


         3.    Observations of Plaintiff

According to defendants, pursuant to the collective bargaining agreement and the Instructional Policies of the Superintendent of Manhattan High Schools, untenured teachers in the New York City Public School System had to be observed in the classroom at least three (3) times per semester in order to evaluate their performance, provide support for teachers who exhibit pedagogical weakness and promote pedagogical strengths.

On or about March 2, 1998, Nelson Acevedo (Acevedo), the assistant principal for social studies at NTHS, observed plaintiff during his Global Studies IV (Bilingual) class. (Klepfish, Ex. Q). Acevedo's observation report included four (4) commendations and seven (7) recommendations, including the following "recommendation:" "There was very little use of English in the lesson. Per Superintendent's directive, English should be incorporated into all

8

bilingual subject area lessons." (Id.). Acevedo then listed six (6) suggestions by which plaintiff could incorporate English into his lessons. (Id.). In sum, Acevedo reported:

> "The lesson was satisfactory. On my next visit, I expect to see the suggestions in this report incorporated in your lessons. Please keep in mind that failure to incorporate the use of English into a bilingual subject area course may lead to an unsatisfactory rating, per Superintendent's directive."

(Id.). Acevedo's report was approved by Frank. (Id.).

On or about April 27, 1998, Acevedo observed plaintiff's Global Studies (Bilingual) lesson. (Klepfish, Ex. R). Acevedo's observation report included four (4) commendations and three (3) recommendations. (Id.). In sum, Acevedo reported that the lesson was "satisfactory" and that he "enjoyed visiting [plaintiff's] class." (Id.).

On or about June 26, 1998, Frank rated plaintiff "Satisfactory" on the "Annual Professional Performance Review and report on Probationary Service of Pedagogical Employee" for the 1997-1998 school year. (Plf. Ex. XVII).

On or about October 9, 1998, Acevedo and Frank observed plaintiff's Global History I (Bilingual) lesson. (Klepfish, Ex. T). The observation report included two (2) commendations and seven (7) recommendations, including the following:

> "There was no English used in the lesson (written or oral). This is a bilingual class where all students were required to take the Regents examination next year in English. * * *. The absence of English in your lesson was discussed with you in a prior observation conference."

(Id.). The report also indicated that at a post-observation conference, plaintiff stated that he was "not going to participate in the conference by answering questions about [his] lesson." (Id.). Acevedo and Frank rated plaintiff's lesson as "unsatisfactory" and indicated that they would observe plaintiff again, at which time they hoped to see the recommendations in the report

utilized in plaintiff's lesson. (Id.). Plaintiff signed the report on October 21, 1998 with a disclaimer that it contained "many error [sic] and untruthful statements." (Id.).

On or about October 21, 1998, Acevedo and Frank again observed plaintiff's Global History I (Bilingual) lesson. (Klepfish, Ex. U). The observation report included no commendations and eight (8) recommendations, including the following:

> "You did not have a written lesson plan. A written lesson plan is a contractual requirement. During the lesson, you admitted to the class that you were 'lost." Having a lesson plan would have enabled you to provide meaningful instruction. There was clearly no evidence in [sic] planning.
>
> * * *
>
> The use of English was extremely limited in this lesson dispute [sic] the fact you told the class you were going to teach in English on this day. * * *. In previous post-observation conferences, I provided you with suggestions to incorporate English into your lessons and you failed to follow my recommendations."

(Id.). The report further indicates the following:

> "At our post-observation conference you indicated that your lesson was satisfactory in every way. This was the extent of your participation. You demonstrated an unwillingness to collaborate on ways of improving your performance."

(Id.). Acevedo and Frank rated plaintiff's lesson as "unsatisfactory" and advised plaintiff that they would return again to his class "shortly", at which time they expected that the recommendations in the report would be incorporated into his lessons. (Id.). In addition, plaintiff was advised that a "[f]ailure to improve may lead to termination of probation and/or an unsatisfactory rating." (Id.). Plaintiff signed the report on October 26, 1998, again with a disclaimer that it contained errors and untruthful statements. (Id.).

On or about November 16, 1998, Acevedo and Frank observed plaintiff's U.S. History

and Government II (Bilingual) lesson, at which Nick Licari (Licari), the UFT Chapter Leader, was also present at plaintiff's request. (Klepfish, Ex. V). The observation report included two (2) commendations, including that plaintiff attempted to infuse English into the lesson, and five (5) recommendations, including the following:

> "There were many spelling and grammatical errors in English throughout the lesson. * * *. Make sure to proofread your lesson plan before presenting it to your students. If we expect our students to be truly 'bilingual' you must display an excellent command of written and spoken English."

(Id.). The report further indicated that at the post-observation conference, plaintiff indicated that he has never participated in a post-observation conference, that he simply attended to hear what the principal thought of his lesson, that the principal is deceitful and that he did not want to participate in the conference. (Id.). In addition, the observation report indicated:

> "There are serious concerns about your proficiency in English and the impact that this has on preparing student for the regents [sic] examinations that they will have to take in English. It is apparent that you must take the time to be certain that your presentation in English is flawless and that our students model you.
>
> The lesson was unsatisfactory. Both of us [Acevedo and Frank] have observed you three times this semester and have seen no improvement. You are to continue to meet Mr. Acevedo on a weekly basis to assist you in developing your lesson plans and improving your instructional techniques. Failure to improve can lead to an extension or termination of probationary service."

(Id.). Plaintiff signed the report with the disclaimer that it was "unfair" and "inaccurate." (Id.).

On December 11, 1998, Acevedo and Frank observed plaintiff's U.S. History and Government II (Bilingual) lesson. (Klepfish, Ex. W). The observation report contained one (1) commendation-- that plaintiff attempted to incorporate English into the lesson-- and six (6) recommendations, including that plaintiff's use of written English continued to be poor and that plaintiff was not following the syllabus. (Id.). The report also noted as follows:

11

> "The lesson was unsatisfactory. You have failed to adequately improve in your instruction. You are not following the course syllabus as directed in a post-observation report. Your written English is still poor as discussed in a post-observation report. * * *. We will look to see improvement in your use of the English language. * * *. Failure to improve may result in an unsatisfactory rating and/or discontinuance of your probationary period."

(Id.). Plaintiff signed the report "with the understanding that it contains many errors [and] misrepresentations." (Id.).

According to defendants, since plaintiff had received several unsatisfactory observations for the Fall 1998 semester, and was in danger of receiving an unsatisfactory rating for the year, his performance needed to be rated by a representative of Manhattan High Schools. Therefore, on December 17, 1998, James Costaras (Costaras), the designee of defendant Superintendent Granger B. Ward (Ward), visited plaintiff's U.S. History and Government bilingual class, accompanied by Acevedo and Frank. (Klepfish, Ex. X). At the post-observation conference, at which Licari was again present at plaintiff's request, Costaras informed plaintiff that he found his lesson unsatisfactory because (1) it reflected poor planning, preparation and development; (2) it involved poor questioning techniques and poor student participation; (3) good classroom routines and procedures were not in place; and (4) plaintiff failed to assess the students' learning and understanding of the lesson. (Id.). The report further noted deficiencies in plaintiff's written English. (Id.). The observation report also notes:

> "During the course of the post-observation conference, you [plaintiff] called me [Costaras] 'a liar' four times and also made such statements as 'You and the Superintendent's Office are part of the problem . . .; you have corrupted the system. . .; you must have been in another room during the lesson. . .; you are making this up to get me and that's why you are here.' In addition you [plaintiff] kept interrupting me [Costaras] throughout the conference.
>
> As a result of this unsatisfactory lesson, I shall recommend to [Ward],

12

Superintendent, that he support Ms. Frank's request for an unsatisfactory rating and for discontinuance of your probationary service, if she so decides."

(Id.). The report was approved by Ward and signed by plaintiff with the following disclaimer:

"I am signing this document with the understanding that its content is unfair [and] full of misrepresentations. Also, this document is intended to punish me for accusing the Chancellor [and] Superintendent Ward for covering up illegal actions of Ms. Stephanie D'Amore Ferrandino against the children attending [MLKHS] while I was assigned there."

(Id.).

### 4. Termination of Plaintiff's Probationary Service

On January 7, 1999, Frank met with Robert J. Reich (Reich), Director of the DOE's Office of Appeals and Reviews, and others, to review plaintiff's file. (Klepfish, Ex. Y). Following the review, Reich advised Frank that it was his opinion that sufficient documentation existed to rate plaintiff unsatisfactory and to recommend denial of the completion of his probation. (Id.).

By letter dated January 9, 1999 to Dr. Margaret R. Harrington (Harrington), Chief Executive for School Programs and Support Services, Ward requested "denial of satisfactory completion of probation for [plaintiff] * * * for unsatisfactory service." (Klepfish, Ex. Z).

By letter dated January 11, 1999 to Ward, Frank summarized her reasons for recommending denial of certification of completion of probation for plaintiff as follows:

"[Plaintiff] is not proficient in the use of standard English. He has demonstrated an inability to construct sentences that are grammatically correct, contain correct punctuation, and free of spelling errors.

Plaintiff has resisted the assistance of his immediate supervisor in improving his professional development and has noted, in front of the UFT representative, that

13

the Assistant Principal knows nothing about social studies.

Lesson planning is either insufficient or non-existent. The lessons observed are characterized by poor planning, preparation and development. [Plaintiff] has demonstrated an inability to follow the curriculum and calendar of lessons which were provided to him. The instructional needs of the bilingual students are not addressed in terms of developing their linguistic skills. Suggested methodology for teaching bilingual students has not been demonstrated.

[Plaintiff] has not been able to form and maintain good relationships with supervisors, teachers and students. His posture is one of arrogance and intimidation. He has consistently demonstrated a lack of professionalism towards any form of authority.

[Plaintiff] has not taken the necessary steps to correct his deficiencies."

(Klepfish, Ex. AA).

By letter to plaintiff dated January 12, 1999, Frank memorialized a meeting she had with plaintiff on that date, at which Licari was present, to discuss allegations that plaintiff "had badgered and intimidated a student." (Klepfish, Ex. BB). Frank directed plaintiff "to cease and desist from engaging in behavior that results in a student feeling uncomfortable, intimidated or harassed." (Id.). Frank advised plaintiff that a failure to heed her directive would result in "severe disciplinary action [being] taken which may result in denial of completion of probation and/or termination." (Id.). Plaintiff signed the letter with the following disclaimer:

"It is a disgrace that you used a child as a way of harassing me. I am signing this document with the understanding that the allegations stated in it are false, unjust and prejudicial."

(Id.).

On the Annual Professional Performance Review and Report on Probationary Service of Pedagogical Employee form, Frank rated plaintiff's performance for the period from September 1998 through January 31, 1999 as unsatisfactory and both she and Ward recommended denial of

14

certification of completion of probation. (Klepfish, Ex. DD).

By letter dated January 15, 1999, defendant Chancellor Rudolph F. Crew (Crew) advised plaintiff that based upon Ward's recommendation, plaintiff's probationary service as a bilingual teacher of social studies at NTHS was terminated as of the close of business on January 19, 1999. (Klepfish, Ex. CC). Crew further advised plaintiff of his entitlement to the review procedures under Section 5.3.4 of the DOE's bylaws. (Id.).

According to defendants, since the relative collective bargaining agreement required that plaintiff receive at least sixty (60) days notice of the denial of his certification of completion of probation, the January 19, 1999 termination date was rescinded and plaintiff was provided an opportunity to work for an additional sixty (60) day period. By letter dated February 1, 1999, Frank advised plaintiff of his responsibilities and assignment for the remainder of his time at NTHS, which was "to translate, into Spanish, the Course Outline, Calendar of Lessons, Aims and write a sample lesson plan for the Economics Curriculum." (Klepfish, Ex. FF). According to defendants, plaintiff refused the assignment on the basis that he was not a translator. (Id.). As a result, by letter dated February 1, 1999, Frank informed plaintiff as follows:

> "Your refusal to perform this assignment is both insubordinate and disruptive to the orderly operation of the school. Accordingly, your denial of completion of probation will take effect immediately, close of business today, February 1, 1999."

(Id.).

5.    Administrative and State Court Proceedings

On or about February 4, 1999, plaintiff filed an appeal of Frank's unsatisfactory rating with Howard Tames, Executive Director of the DOE Personnel Division. (Klepfish, Ex. II).

Plaintiff filed a grievance alleging that he was terminated without his entitlement of sixty (60) days notice, in violation of New York State Education Law section 2573. (Klepfish, Ex. EE). The Step II Grievance Decision by Hearing Officer Robert R. Mastruzzi (the HO), dated March 24, 1999, denied the grievance, finding that Frank's dismissal of plaintiff on February 1, 1999 after he refused to do an assignment which was relevant to his license as a bilingual teacher was appropriate. (Id.). By letter dated April 13, 1999, plaintiff requested a conference pursuant to Article 22B of the collective bargaining agreement to discuss the grievance. (Id.).

According to defendants, on May 11, 1999, plaintiff's union advisor, Dan Acosta (Acosta), requested that Reich postpone the appeal hearing due to plaintiff's alleged illness. (Klepfish, Ex. JJ). Reich allegedly told Acosta that plaintiff's request would not be honored absent submission of a doctor's note by the close of that business day. (Id.).

On or about May 12, 1999, the Chancellor's Committee deemed plaintiff's appeal abandoned on the basis that plaintiff did not appear for the scheduled appeal hearing and did not submit a doctor's note substantiating an illness.[4] (Klepfish, Ex. II). By letter dated May 17, 1999, Reich advised Acosta that plaintiff's case was closed in light of his absence from the appeal hearing and failure to timely submit a doctor's note. (Klepfish, Ex. JJ).

On or about February 16, 2000, plaintiff filed a proceeding in the Supreme Court of the State of New York, Kings County (the state court), pursuant to Article 78 of N.Y. C.P.L.R. against the BOE, challenging his termination and seeking to compel his reinstatement to his teaching position and to grant him tenure by estoppel. (Klepfish, Ex. KK). Plaintiff alleged,

---

[4] Indeed, the doctor's note submitted by plaintiff not only fails to substantiate a specific illness, but is dated May 14, 1999, two days after the hearing. (Supp. Ex. LI).

16

*inter alia*, that he was notified of his termination on February 1, 1999, "only one day before the expiration of his probationary period," in violation of New York Education Law § 2573(1)(a), which requires sixty (60) days notice. (Id. at ¶¶ 7-8).

By judgment dated November 17, 2000, the state court (Garry, J.), denied plaintiff's application and dismissed the petition. (Klepfish, Ex. LL).

### B. Procedural Background

On June 8, 2001, plaintiff Ricardo Brenes (plaintiff) commenced this civil rights action pursuant to 42 U.S.C. § 1983 against defendants alleging violations of his First Amendment free speech rights. Specifically, plaintiff claims that he was retaliated against for his "blow[ing] the whistle" on the purported corruption and attendance fraud he observed in the high school at which he worked.

Defendants now move pursuant to Rule 56 for summary judgment dismissing plaintiff's complaint and plaintiff cross-moves pursuant to Rule 56 for summary judgment. In addition, plaintiff separately moves pursuant to 28 U.S.C. §§ 455(a) and (b)(1) for me to recuse myself from this action.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment should not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted). "A fact is material when it might affect the outcome of the suit under governing law." Id. An issue of fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The moving party bears the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to establish the existence of a factual question that must be resolved at trial. See Koch v. Town of Brattleboro, Vermont, 287 F.3d 162, 165 (2d Cir. 2002) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

B.     First Amendment Retaliation

Defendants contend that plaintiff does not have a cognizable First Amendment retaliation claim because (1) he cannot establish that he was not speaking pursuant to his official duties as an employee of defendants; (2) his claims prior to June 6, 1998 are time-barred; (3) he cannot establish a causal connection between the claims that are not time-barred, i.e., that he was denied the satisfactory completion of probation on January 19, 1999 and was terminated on February 1, 1999, and the exercise of his First Amendment rights; and (4) he cannot establish that his speech was a substantial motivating factor in his termination since the evidence shows that plaintiff's

pedagogical performance steadily declined prior to the denial of certification of completion of probationary service and his termination. In addition, defendants contend that since the claims that are not time-barred only allege the personal involvement of defendants Frank, Ward and Crew, the complaint must be dismissed as against the remaining individual defendants. Moreover, defendants contend that plaintiff's claims against Frank and Ward must be dismissed because the evidence establishes that those defendants were not aware of plaintiff's comments regarding attendance while he was assigned to NTHS. Defendants further contend that plaintiff cannot establish municipal liability on the part of the City and BOE.

In order to establish a First Amendment retaliation claim, plaintiff must prove that: "(1) [he] engaged in constitutionally protected speech because [he] spoke as [a] citizen[] on a matter of public concern; (2) [he] suffered an adverse employment action; and (3) the speech was a motivating factor in the adverse employment decision." Skehan v. Village of Mamaroneck, 465 F.3d 96, 106 (2d Cir. 2006) (internal quotations and citations omitted). "If a plaintiff makes [the] required showing, defendants may nevertheless escape liability if they can demonstrate that either (1) the defendant would have taken the same adverse action against the plaintiff regardless of the plaintiff's speech; or (2) the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression.[5]" Id.

---

[5] Defendants do not contend that the plaintiff's expression would have caused disruption that outweighed the value of plaintiff's speech and, thus, this factor will not be addressed.

1.    Constitutionally Protected Speech[6]

"[P]ublic employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak *as a citizen* addressing matters of public concern." Garcetti v. Ceballos, 126 S.Ct. 1951, 1957, 164 L.Ed.2d 689 (2006) (emphasis added). In identifying what constitutional protections are to be accorded to public employee speech, the court must first determine "whether the employee spoke as a citizen on a matter of public concern. * * * If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. * * * If the answer is yes, then the possibility of a First Amendment claim arises." Id. at 1958. (citation omitted). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 1960.

"The First Amendment protects some expressions related to the speaker's job." Garcetti, 126 S.Ct. at 1959. "Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." Id. (citing Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., Illinois, 391 U.S. 563, 572, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).

---

[6] Defendants do not dispute that plaintiff's speech at issue addressed a matter of public concern, nor could they. "Exposing governmental inefficiency and misconduct is a matter of considerable significance." Garcetti v. Ceballos, ___ U.S. ___, 126 S.Ct. 1951, 1962, 164 L.Ed.2d 689 (2006). Thus, as a matter of law, plaintiff's speech regarding the attendance problems at MLKHS addressed a matter of public concern.

The duties and responsibilities of a dean at MLKHS include "to follow up and act upon cutting * * *" and "to maintain adequate records of pupil offenses, measures taken to correct these offenses and the notification of parents." (Klepfish, Ex. F). Plaintiff, in fact, testified that his duties as dean included "deal[ing] with students' attendance * * *." (Plf. Dep., pp. 32-33). In addition, plaintiff testified that he was able to get all of the attendance records of the students at MLKHS, from which he noted the discrepancies in attendance of which he complained, because of his position as dean of that school. (Id., pp. 39-40). Moreover, plaintiff testified that he relied on his dean files when he was dealing with the students' parents regarding their attendance and that his discussions with the students' parents were part of the responsibilities that he had as a dean. (Id. at 50, 55, 58-59). Thus, plaintiff's communications to the students' parents, as well as to the chancellor, special investigator and superintendent, regarding attendance at MLKHS were clearly taken pursuant to plaintiff's official duties as dean of that school and plaintiff has no First Amendment retaliation cause of action for defendants' reaction to that speech. See, e.g. Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d 1192, 1204 (10th Cir. 2007) (finding, *inter alia*, that the speech of the plaintiffs, who were teachers at the defendant school, which related to the regulation of student behavior, the curriculum and pedagogy, and to the need for certain materials, were made pursuant to their official duties and, thus, could be freely regulated); Williams v. Dallas Independent School Dist., 480 F.3d 689, 694 (5th Cir. 2007) (per curiam) (finding that the statements made by the plaintiff, the athletic director at the defendant school, in his memoranda focused on his daily operations and, thus, were made in the course of performing his employment and were not protected by the First Amendment); Battle v. Board of Regents for Georgia, 468 F.3d 755, 761 (11th Cir. 2006) (finding that the plaintiff's retaliation

21

claim failed because she, in her capacity as an employee in the defendant's Office of Financial Aid and Veterans Affairs, had a clear employment duty to ensure the accuracy and completeness of student files and to report any mismanagement or fraud in the student financial aid files). Accordingly, to the extent plaintiff's claims are premised upon his communications to the students' parents, chancellor, special investigator, superintendent, and other supervisory personnel regarding attendance at MLKHS, those claims are dismissed.

However, plaintiff's communications to the New York Post regarding the attendance problems at MLKHS were not taken pursuant to his official duties as dean. The Supreme Court in Garcetti specifically contrasted the facts of that case-- where an internal memorandum was written pursuant to the plaintiff's official duties and, thus, was not accorded First Amendment protection-- with the case of Pickering, where the relevant speech was a teacher's letter to a local newspaper addressing issues including the funding policies of his school board which, according to the Supreme Court, had "no official significance and bore similarities to letters submitted by numerous citizens every day," and, thus, was accorded First Amendment protection. Garcetti, 126 S.Ct. at 1960. "Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government." Id. at 1961. As in the case of Pickering, plaintiff's communications to the New York Post bore no official significance and cannot be said to have been taken pursuant to his official duties as dean. See, e.g. Weintraub v. Board of Education of City of New York, 489 F.Supp.2d 209, 219 (E.D.N.Y. 2007) (holding that if an employee goes outside of the established institutional channels in order to express a complaint or concern, he or she is speaking as a citizen and that speech is protected

by the First Amendment). Accordingly, to the extent plaintiff's claims are premised upon his communications to the New York Post, he retains some possibility of First Amendment protection.

### 2. Personal Involvement of Defendants

Although "a claim for relief under 42 U.S.C. § 1983 only need allege that some person acting under color of state law deprived the claimant of a federal right," Green v. Maraio, 722 F.2d 1013, 1016 (2d Cir. 1983), it is well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Back v. Hastings on Hudson Union Free School Dist., 365 F.3d 107, 122 (2d Cir. 2004)(internal quotations and citation omitted); see Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997); see also Skehan, 465 F.3d at 106 (holding that a plaintiff must establish that each defendant "was personally involved . . . in the alleged constitutional deprivations"). "Personal involvement" may be established by evidence of direct participation by the supervisor in the challenged conduct, or by evidence of a supervisory official's "(1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." Hayut v. State Univ. of New York, 352 F.3d 733, 753 (2d Cir. 2003).

The complaint fails to allege any personal involvement of defendants D'Amore

Ferrandino, Turetsky or John Ferrandino[7] in any of the alleged adverse actions occurring after publication of the article in the New York Post, which, as noted above, is the only communication upon which plaintiff may base his First Amendment retaliation claim. Accordingly, the claims against those defendants are dismissed.

### 3. Causal Connection

With respect to plaintiff's claims against the remaining defendants, he must still demonstrate a "causal connection . . . sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action." Cotarelo v. Village of Sleepy Hollow Police Dept., 460 F.3d 247, 251 (2d Cir. 2006) (internal quotations and citation omitted). This causal connection may be demonstrated either "indirectly, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus" directed against the plaintiff by defendant. Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir. 2004) (internal quotations and citation omitted). While there is no "bright-line" rule for establishing a sufficient temporal link, "the interval between a protected activity and an adverse action that results in a finding of retaliation is generally no more than several months." Ashok v. Barnhart, 289 F.Supp.2d 305, 314 (E.D.N.Y. 2003); see, e.g. Hollander v. American Cyanamid, Co., 895 F.2d 80 (2d Cir. 1990)(finding a lack of causal nexus where there was a three month gap between the filing of plaintiff's discrimination complaint and the allegedly adverse actions);

---

[7] A suggestion of death was filed as to defendants Emanuelson and Stancik on December 13, 2005. By order dated December 27, 2005, plaintiff was directed to move for substitution of those defendants by March 13, 2006 or his claims against them would be dismissed. As plaintiff failed to comply with that order, the claims against Emanuelson and Stancik were dismissed pursuant to that order.

James v. Newsweek, No. 96 Civ. 0393, 1999 WL 796173, at * 15 (S.D.N.Y. Sept. 30, 1999), aff'd, 213 F.3d 626 (2d Cir. 2000)(finding no casual connection where there was a four month gap between the protected activity and the adverse action); Carr v. Westlb Admin., Inc., 171 F.Supp.2d 302, 310 (S.D.N.Y. 2001) (finding no causal connection where there was almost a four month gap between the protected activity and adverse action).

Plaintiff has not proffered any direct evidence of retaliatory animus directed against him by defendants. Moreover, plaintiff has failed to indirectly establish a causal connection between his expression as set forth in the New York Post and any allegedly adverse action taken by any of the defendants, with the exception of Stoopack. The New York Post article was published on or about December 21, 1997. Sometime between January 20, 1998 and February 2, 1998, approximately one month after the article, plaintiff was excessed by Stoopack in purported violation of the collective bargaining agreement. Thus, there is indirect evidence of a causal connection between that conduct by Stoopack and plaintiff's expression in the New York Post.

However, the first allegedly adverse employment action taken by any of the other remaining defendants against plaintiff following that article was that Acevedo and Frank gave plaintiff an "unsatisfactory" rating on the report of Acevedo's observation of plaintiff on October 9, 1998, almost ten (10) months later and after having previously rated plaintiff's performance as satisfactory on three (3) prior occasions. (Klepfish, Exs. Q, R and T; Plf. Ex. XVII). Accordingly, summary judgment dismissing plaintiff's First Amendment retaliation claim against all defendants except Stoopack is appropriate.

4.    Adverse Employment Action

25

With respect to plaintiff's remaining First Amendment retaliation claim against Stoopack–that he was improperly excessed in violation of the collective bargaining agreement, he must establish that this action constituted an adverse employment action in order to establish a First Amendment retaliation claim.

> "In the context of a First Amendment retaliation claim, * * * [o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action. * * * In this context, adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand. * * * This list of retaliatory conduct is certainly not exhaustive, however, and lesser actions may also be considered adverse employment actions. * * * Adverse employment actions may include negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities."

Zelnik v. Fashion Institute of Technology, 464 F.3d 217, 226 (2d Cir. 2006), cert. denied, 127 S.Ct. 2062, 167 L.Ed.2d 769 (2007) (internal quotations and citations omitted). "[W]hether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination. * * * A plaintiff cannot support such a determination unless he can show that an alleged act of retaliation is more than de minimis." Id. (internal quotations and citations omitted).

Based upon the factual record, it cannot be said that a jury could conclude that the excessing of a regular substitute teacher from one school, who is thereafter immediately appointed as a probationary teacher in the field in which he was licensed to another day high school in the district without any loss of compensation or benefits, would "deter an individual of ordinary firmness," situated similarly to plaintiff, from exercising his or her free speech rights

under the facts of this case. Plaintiff has proffered no evidence that his position at NTHS was less desirable than his position at SPHS or that the reassignment to NTHS entailed a dramatic negative change in the nature of his work. See, e.g. Grennan v. Nassau County, No. CV-04-2158, 2007 WL 952067, at * 9-10 (E.D.N.Y. Mar. 29, 2007) (finding that the plaintiff's transfer did not constitute an adverse employment action where it did not entail a change in the nature of her work). Indeed, his appointment on February 2, 1998 and assignment to NTHS in lieu of his regular substitute teacher position afforded plaintiff the opportunity to become eligible for tenure and a permanent appointment, which he would not have achieved in his capacity as a regular substitute teacher at SPHS. Accordingly, the excessing of plaintiff from SPHS by Stoopack does not constitute an adverse employment action under the facts of this case. Thus, summary judgment dismissing plaintiff's remaining First Amendment claim as against Stoopack is warranted.[8]

### C.     Plaintiff's Additional Claims

Although plaintiff sets forth only one cause of action in his complaint, pursuant to 42 U.S.C. § 1983, plaintiff contends that he also set forth claims pursuant to 42 U.S.C. § 1981, as well as claims for the denial of his due process rights because he had been granted tenure by operation of law. To the extent plaintiff is seeking leave to amend his complaint to allege such causes of action, his application is denied.

Fed. R. Civ. P. 15(a) provides that leave to amend a complaint "shall be freely given

---

[8] In light of this determination, it is unnecessary to consider defendants' remaining contentions.

when justice so requires." "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Absent a showing of undue delay, bad faith or dilatory motive on the part of the plaintiff, undue prejudice to the defendant, or the futility of the amendment, a plaintiff should be granted leave to" amend. Id. at 182, 83 S.Ct. 227. If amendment would be futile, i.e. if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6), leave to amend may be denied. See Lucente v. International Business Machines Corp., 310 F.3d 243, 258 (2d Cir. 2002).

1. Section 1981

42 U.S.C. § 1981(a) provides as follows:

> "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

Thus, Section 1981 is concerned only with racial discrimination claims, as well as claims of retaliation based upon complaints of racial discrimination, see, e.g. Long v. Marubeni America Corp., 406 F.Supp.2d 285, 290 (S.D.N.Y. 2005) (holding that because Section 1981 is concerned only with discrimination on the basis of race, its implicit prohibition of retaliation against those who complain of discrimination is similarly limited to complaints of racial discrimination), and is inapplicable to plaintiff's First Amendment retaliation claims. See id. (holding that retaliation for complaints of illegal conduct having nothing to do with employment discrimination does not

violate Section 1981). Thus, to the extent plaintiff is seeking leave to amend his complaint to add a claim pursuant to Section 1981, his application is denied.

### 2.  Due Process Claims

To the extent plaintiff is seeking leave to amend his complaint to assert a claim that his termination was improper and violated his due process rights, since he obtained tenure by operation of law, those claims are barred by the doctrine of res judicata.

Under the doctrine of res judicata, or claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); see Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286-287 (2d Cir. 2002). To establish the affirmative defense of res judicata, the defendant must show (1) that the prior action involved an adjudication on the merits; (2) that the prior action involved the same plaintiffs or those in privity with them; and (3) that the claims asserted in the subsequent action were, or could have been, raised in the previous action. Monahan v. New York City Dept. of Corrections, 214 F.3d 275, 285 (2d Cir. 2000).

"Whether a claim that was not raised in the previous action could have been raised therein depends *in part* on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first. * * * Also dispositive to a finding of preclusive effect, is whether an independent judgment in a separate proceeding would impair or destroy

29

rights or interests established by the judgment entered in the first action." Marvel, 310 F.3d at 287 (internal quotations and citations omitted) (emphasis in original). The determination of whether two actions arise from the same transaction or claim involves consideration of "whether the underlying facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." Id. (internal quotations and citation omitted). A prior judgment does not have preclusive effect where the claims in the subsequent action did not even exist at the time of the prior action or where the court in the prior action could not have awarded the relief requested in the new action. Id.

In the Article 78 proceeding in state court filed by plaintiff on or about February 16, 2000, he, *inter alia*, challenged his termination and sought to compel his reinstatement to his teaching position and to grant him tenure by estoppel. (Klepfish, Ex. KK). By judgment dated November 17, 2000, the state court (Garry, J.), denied plaintiff's application and dismissed the petition. (Klepfish, Ex. LL). Accordingly, there was an adjudication on the merits of that state court action, which involved the same plaintiff as the present action, and the tenure by estoppel claims were either directly asserted in the previous action, or could have been raised thereon. Thus, the doctrine of res judicata bars plaintiff's tenure by estoppel or operation of law claims in this action.

D.     Plaintiff's Motion for Recusal

Plaintiff seeks, pursuant to 28 U.S.C. §§ 455(a) and (b)(1), to have me recuse myself

from this action on the basis that by order entered March 5, 2007, I denied his request to "amend discovery" to depose three (3) of the defendants, filed ten (10) months after discovery had been closed, and that my rulings in the case thus far have been appeared to favor defendants.

28 U.S.C. §455 provides, in relevant part, as follows:

> "(a) Any justice, judge or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

> (b) He shall also disqualify himself in the following circumstances: (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; * * *."

Although subsection (a) deals only with "the objective appearance of partiality," and subsection (b) contains a "subjective knowledge requirement," Liteky v. United States, 510 U.S. 540, 553, n.2, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994), both provisions require a court to ask "whether a reasonable person, knowing all the facts, would conclude that the court's impartiality might reasonably be questioned." Cole v. United States, No. 98 CV 7670, 2006 WL 3257254, at * 2 (E.D.N.Y. Sept. 25, 2006) (citation omitted). Generally, a party seeking recusal under either provision will succeed only if he or she demonstrates that the alleged bias and prejudice stem from an extrajudicial source. See Tese-Milner v. Holland, No. 97-CV-4904, 1997 WL 1048898, at * 3 (E.D.N.Y. Nov. 26, 1997). "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." LoCascio v. United States, 473 F.3d 493, 495 (2d Cir. 2007), cert. denied, ___ S.Ct. ___, 2007 WL 2978337 (Nov. 5, 2007); see also Tese-Milner, 1997 WL 1048898, at * 3 (holding that it is only in the rarest circumstances that judicial rulings alone can warrant recusal).

Plaintiff does not allege that this Court's alleged bias stems from an extrajudicial source and he has not proffered any evidence of the Court's personal bias or prejudice against him or of the Court's personal knowledge of disputed evidentiary facts concerning this action that would call its impartiality into question. Rather, the sole basis of plaintiff's motion for recusal is the history of unfavorable rulings made against him in this case, which is an insufficient ground for recusal. Accordingly, plaintiff's motion for recusal is denied.

III.    CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted and the complaint is dismissed in its entirety, plaintiff's cross motion for summary judgment is denied as moot and plaintiff's motion for recusal is denied. The clerk of the Court is directed to close this case.

SO ORDERED.

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: November 9, 2007
        Central Islip, New York

Copies to:
Ricardo Brenes, *pro se*
386 Ft. Washington Avenue, Apt. 4C
New York, New York 10033

32

New York City Law Department
Office of the Corporation Counsel
100 Church Street
New York, New York 10007-2601
Attn: Jason Robert Bogni