UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

RICARDO BRENES,

                              Plaintiff,

                -against-

JOANNE FRANK, Principal, Norman Thomas High
School, Individually and in her Official Capacity;
RUDOLPH CREW, Individually and in his former
Official Capacity as Chancellor; GRANGER WARD,
Individually and in his former Official Capacity as
Manhattan Superintendent; the NEW YORK CITY
DEPARTMENT OF EDUCATION OF THE CITY OF
NEW YORK and THE CITY OF NEW YORK  THE
BOARD OF EDUCATION OF THE CITY OF NEW
YORK,

                              Defendants.

------------------------------------------------------------------------ x

**DEFENDANTS'
STATEMENT OF
UNDISPUTED FACTS
PURSUANT TO LOCAL
CIVIL RULE 56.1**

01 Civ. 3943 (TLM) (LB)

        Defendants, by their attorney, Michael A. Cardozo, Corporation Counsel of the

City of New York, respectfully submits, pursuant to Local Rule 56.1 of the Civil Rules of the

Southern District of New York, that the following facts are not subject to genuine dispute:[1]

### Plaintiff's Work History

        1.      Plaintiff was first employed by the BOE in April, 1993 and terminated

effective February 1, 1999.  <u>See</u> Human Resources System ("HRS") List Report, Bates Stamp

---

[1]   Unless otherwise indicated, all references to "Exhibits" are to the exhibits annexed to the
Declaration of Larry Martinez, dated January 15, 2010.  The Court has limited summary
judgment motions and cross-motions to the issue of whether plaintiff was deprived of a property
interest in employment without due process of law.  <u>See</u> Order, dated August 13, 2009, Docket
Entry 134.

No. 0155 ("Pl. HRS List Report") which is annexed hereto as Exhibit "C." [2]; <u>see</u> <u>also</u> <u>generally</u> First Amended Complaint, dated May 21, 2009, ("Am. Comp.") Exhibit "A"; <u>see</u> <u>also</u> Amended Answer, dated November 16, 2009, Exhibit "B,"; Deposition of Victoria Campbell, Deputy Director of the DOE Office of Field Services, dated November 17, 2009, ("Campbell Dep.") which is annexed hereto as Exhibit "D"; Declaration of Christine Kicinski, DOE Assistant Deputy Counsel, filed October 6, 2006 ("Kicinski Decl.") with attached exhibit "A," (Plaintiff's HRS Service History Report)[3] which are annexed hereto as Exhibit "E"; Plaintiff's Deposition, taken on October 5, 2005 (Pl. 10/5/05 Dep.") and October 11, 2005 ("Pl. 10/11/05 Dep."), which are annexed hereto as Exhibit "F"; Plaintiff's Deposition taken on November 24, 2009 ("Pl. 2009 Dep."), which is annexed hereto as Exhibit "G."

**A.**     <u>**Plaintiff's History at the BOE: David Ruggles Middle School, April 1993 - June 1993.**</u>

    2.    On or about April, 1993, plaintiff was hired by the DOE.  <u>See</u> Pl. 10/5/05 Dep., Exhibit "F," at 25:7-26:20; <u>see also</u> Pl. 2009 Dep., Exhibit G at 23:16-23:25; Pl. HRS List Report, Exhibit "C."

    3.    At the time that he was hired, plaintiff possessed an "Occasional Per-Diem Certificate" (license code "PDTR") that was issued by the BOE. <u>See</u> Campbell Dep., Exhibit "D," at 10:16-11:23; <u>see also</u> Pl. HRS List Report, Exhibit "C."

    4.    Plaintiff served as an occasional per-diem substitute teacher at "David Ruggles Middle School" where he taught from April, through June 1993.  <u>See</u> Pl. 10/5/05 Dep., Exhibit "F" at 25:7-26:20; <u>see also</u> Pl. HRS List Report, Exhibit "C."

---

[2] The HRS List Report lists all licenses, with certification dates, that plaintiff was authorized to teach under from September 8, 1992 through July 4, 1997.

[3] The HRS Service History Report lists plaintiff's employment status, licenses, and teaching locations from September 7, 1993 through January 31, 1999.

5.  The terms and working conditions of occasional per-diem substitute teachers are regulated by Chancellor's Regulation C-206.  In particular, per diem substitute service does not generally lead to tenure.  <u>See</u> Chancellor's Regulation C-206, "Occasional Per-Diem Substitute Service;"; <u>see also</u> (a) C-200, "License Terms," (effective 1993 & effective 2000); (b) C-201, "Responsibilities of the  Office of Recruitment, Personnel Assessment and Licensing,"; (d) C-205 "General License Provisions and Requirements,"; (e) C-31, "Procedures for Termination of Licenses Or Certificates Held By Substitute Teachers or Regularly Licensed Personnel Who Have Not Achieved Tenure,"; and (g) Article 5 of the BOE By-Laws, Bates Stamp, 0835-08423, all  as Exhibit "H."

6.  As an occasional per-diem substitute teacher, plaintiff was authorized to teach at BOE schools on a short-term basis. <u>See</u> Chancellor's Reg. C-206(2), (3), (4), Exhibit "H"; <u>see also</u> Pl. 10/5/05 Dep., Exhibit "F" at 27:2-27:20.

7.  In order to be considered a "regular substitute," and provide substitute services of a more protracted nature, plaintiff was required to obtain either:

(a) conditional DOE license;

(b) Certificate of Qualification issued by the New York State Department of Education ("SED");

(c) a Certified Provisional Teaching ("CPT") certificate or;

(d) a Preparatory Provisional Teaching ("PPT") certificate.

<u>See</u> Chancellor's Regulation C-200(26), (11), (12), (18), "License Terms," Exhibit "H."

8.  Without one of these four certifications, plaintiff could continue to work as a "long term" per-diem substitute provided that he pursued academic study leading to a PPT

certificate.  See Chancellor's Regulation C-206 (4), Exhibit "H"; see also Payroll Handbook for Pedagogical Employees, Bates Stamp Nos. 0153-0154, Exhibit "I."

**B.**      **Plaintiff's History at the BOE: MLKHS – September, 1993, through June, 1994.**

9.      On September 7, 1993, plaintiff was assigned to Martin Luther King Jr. High School ("MLKHS") in Manhattan, New York.  See Pl. 2009 Dep., Exhibit "F" at 24; see also Kicinski Decl., Exhibit "E" ¶¶ 4, 6.

10.      Plaintiff was assigned to MLKHS as a long-term per-diem substitute for the 1993-94 school year.  See generally id.

11.      BOE High Schools were part of the "City School District" which operated under the direct jurisdiction of the Chancellor rather than through a local Community School District.  See Chancellor's Regulation C-200 (7), Exhibit "H."

12.      Rudolph F. Crew was the Chancellor of the BOE from 1995 through 1999. See deposition of former Chancellor Rudolph F. Crew, taken on December 4, 2009 ("Crew Dep."), Exhibit "J," at 8:15-8:22.

13.      Granger B. Ward, was the Superintendant of Manhattan High Schools from July, 1996 through June, 1999. See deposition of Granger B. Ward, taken on December 2, 2009 ("Ward Dep."), Exhibit "K," at 5:12-5:21.

14.      Steven Gutman was the Executive Assistant to the Superintendant of Manhattan High Schools. See deposition of Steven Gutman, taken on November 12, 2009, ("Gutman Dep."), Exhibit "L," at 6:5-6:10.

15.      Maria Emmanualson was the Director of Manhattan High School Staffing Services.   See Campbell Dep., Exhibit "D," at 27:13-28:3; see also deposition of Stanley Turetsky, taken on October 11. 2005, ("Turetsky Dep.") Exhibit "W," at 14:19-14:23.

16.     Stephanie Ferrandino ("Principal Ferrandino"), was the Principal of MLKHS throughout plaintiff's employment at the school. See Pl. 10/5/05 Dep., Exhibit "F," at 30:3-30:5.

17.     During the 1993-1994 school year, plaintiff taught bi-lingual social studies (License Code 707B) at MLKHS. [4]  See Kicinski Decl., Exhibit "E," ¶ 6.

18.     On or about June 15, 1994, Principal Ferrandino rated plaintiff's substitute service for the 1993-94 school year as "satisfactory."   See Annual Professional Performance Review And Report On Probationary Service of Pedagogical Employee, ("Evaluation"), Bates Stamp No. 1142. Exhibit "M."[5]

## C.    Plaintiff's History at the DOE: MLKHS – September, 1994, through June, 1995.

19.     Plaintiff was issued a Preparatory Provisional Teaching ("PPT") certificate, dated August 26, 1994, from the BOE.  A PPT is valid for one year and plaintiff's was renewed in the Summer of 1995 and 1996.  See PPT Certificate, dated August 26, 1994; Bates Stamp No. 1161; PPT Certificate, dated July 27, 1995, Bates Stamp No. 1159; PPT Certificate, dated August 8, 1996, Bates Stamp No. 1158, ("Provisional Certificates"), all  as Exhibit "N."

20.     Plaintiff was required to renew his PPT certificate each year and could receive a maximum of three renewals for a total period of three years, provided that he: (a) received satisfactory performance ratings during each year of service; and (b) demonstrated

---

[4] During all relevant periods, a "school year" ran from September through June. See e.g. Pl. 2009 Dep., Exhibit F at 24:5-24:8.

[5] For the Court's convenience, exhibits containing multiple documents are arranged by chronological order.

progress toward state provisional certification.  See CBA, Article 5 (C),(2), Exhibit "O."; see also Pl. 2009 Dep., Exhibit  "G," at 25:19-26:2.

21.     The terms and conditions of PPTs are regulated by, among other things: (a) Article 5 of the collective bargaining agreement ("CBA") between the teacher's union, the United Federation of Teachers ("UFT"), and the BOE and; (b) Chancellor's Regulation C-200. See CBA, Article 5 (C),(2), Exhibit "O,"[6]; see also Chancellor's Reg. C-200, (26),(b), Exhibit "H."

22.     As a PPT, plaintiff worked as a "regular substitute" and was authorized to teach Bi-Lingual Social Studies in BOE day high schools from September 8, 1994, through August 31, 1995.  See Pl. HRS List Report, Exhibit "C,"; Chancellor's Regulation C-200(26), Exhibit "H,"; Campbell Dep., Exhibit "D," at 18:14:-18:16.

23.     On or about September 29, 1994, Principal Ferrandino selected plaintiff to be a Dean at MLKHS.  See letter from Principal Ferrandino to plaintiff, dated September 29, 1994, with corresponding Dean's "Duties and Responsibilities," Exhibit "P."

24.     The Dean position, which relieved plaintiff from three teaching periods, gave plaintiff some oversight responsibilities for students' attendance, latenesses, and cutting. See generally id.

25.     On January 4, 1995, plaintiff received a disciplinary letter in file ("LIF") from the Assistant Principal ("AP") for Pupil Personnel Services, Deena Forman ("A.P. Forman"),based on several disturbing incidents which included:

(a) plaintiff pushing a student, "Niesha H." out of his office;

---

[6] During all relevant periods throughout this litigation, plaintiff was covered by the CBA that was effective between October 16, 1995-November 15, 2000.

(b) plaintiff threatening to place a student in "special education" if his behavior did not improve; and

(c) endangering the safety of school safety officers by leaving the scene of an incident involving a student.

See (a) LIF, dated January 4, 1995, Bates Stamp Nos. 0352-0353; (b) LIF, dated January 26, 1995, Bates Stamp No. 0421-0422; (c) letter from UFT Chapter Leader Fran Lowenfeld, dated April 24, 1995, Bates Stamp Nos. 0372-0373; (d) letter from Guidance Counselor, Barry Liebman, to Steven Gutman, Executive Assistant to the Superintendant of Manhattan High Schools dated May 12, 1995 with attached incident report, Bates Stamp Nos. 0364-0366; (e) letter, dated May 22, 1995, Bates Stamp Nos. 0417-0419; (f) memorandum from Milton Siler to Principal Ferrandino, dated September 19, 1995, Bates Stamp Nos. 0414-0415, ("Dean Incident Reports"), collectively Exhibit "Q."

26.     On January 26, 1995, plaintiff received a second disciplinary letter to the file based on an incident where plaintiff berated a student, "Kim D.," and disrupted her during a science exam. See letter, dated January 26, 1995, Bates Stamp Nos. 0421-0422, Exhibit "Q,"; see also Pl. 10/5/05 Dep., Exhibit "F," at 134:1-136:1.

27.     On April 24, 1995, the school's UFT Chapter Leader, Fran Lowenfeld, wrote AP Forman informing her of several incidents relating to plaintiff's treatment of parents and students that she stated "bordered on contempt for the students."  The UFT Chapter Chair wrote:

> [Plaintiff] has been counseled by Milt Silver  and
> other deans and by you and the principal regarding
> his negative performance as a dean and nothing
> seems to have worked.

* * *

> [Plaintiff] is under the impression that authoritarian methods are the only means of making students respect authority and is convinced that his rigid methods will put an end to antisocial behavior. . . What I believe is missing from his approach to students is understanding our role which entails delicately balancing discipline and compassion when making decisions regarding student behavior…

<u>See</u> Letter from Fran Lowenfeld to AP Forman, dated April 24, 1995, Bates Stamp Nos. 0372-0373, Exhibit "Q."

28.   Less than two weeks later, on May 12, 1995, "Camille G.," a student that plaintiff tried to suspend on two prior occasions, attempted to commit suicide by slashing her wrists in school after being berated by the plaintiff.  <u>See</u> letter from Guidance Counselor, Barry Liebman, to Steven Gutman, Executive Assistant to the Superintendant of Manhattan High Schools, dated May 12, 1995, Bates Stamp Nos. 0364-0366, Exhibit "Q," <u>see</u> <u>also</u> Pl. 10/5/05 Dep., Exhibit "F at 136:17-137.17.

29.   Plaintiff filed a grievance challenging the letter contended during the grievance process that he never received training on dealing with "at risk" students and should not therefore be blamed for driving Camille G. to a suicide attempt. <u>See</u> Step III Grievance Decision, dated November 7, 1995, Bates Stamp Nos. 0447-0448, Exhibit "S."

30.   On May 22, 1995, AP Forman convened a meeting with plaintiff and his UFT representative to discuss yet another incident between plaintiff, a student "Durrell D." and Durrell D.'s guardian.  The guardian charged plaintiff with threatening to "destroy" the student's career if she and her mother did not obey his orders.  <u>See</u> letter from AP Forman to the plaintiff, dated May 22, 1995, Bates Stamp Nos. 0417-0419, Exhibit "Q."

31.     Plaintiff objected to the decision of AP Forman, his supervisor, to convene the meeting.  Specifically, AP Forman noted:

> I found it difficult to believe the manner in which you addressed me. Since I work closely with the Principal, and at times serve as her designee, your question regarding my familiarity with Chancellor's Regulations was disrespectful and insulting. Your condescending manner sounded much like that described by the students and parents who had made complaints about you.

Id.

32.     During his time as Dean, plaintiff was given three mentors which were assigned to help plaintiff remedy his autocratic behavior.  See memorandum from Milton Siler to Principal Ferrandino, dated September 19, 1995, Bates Stamp Nos. 0414-0415, Exhibit "Q."

33.     However, each of the three deans assigned to mentor plaintiff sought to be removed as plaintiff's mentor citing plaintiff's resistance to changing his behavior.  Id.

34.     In reviewing his experiences with the plaintiff as his third mentor, Milton Siler,  noted that:

> I found it extremely difficult to convey the rationale[s] and reason[s] for specific procedures and approaches to the role of dean. [Plaintiff] always had an explanation that outweighed any suggested ways for improvement. His common response was that he would do what I suggested [only] if I made it a direct order.

Id.

35.     By letter, dated May 30, 1995, Principal Ferrandino advised plaintiff that as of that date plaintiff would no longer be serving as Dean of MLKHS.  See letter from Principal Ferrandino to the plaintiff, dated May 30, 1995, Exhibit "R."

36.     Pursuant to the grievance procedures set forth in Article 22(B) of the UFT collective bargaining agreement, plaintiff filed  "Step I," "Step II," and "Step III" grievances challenging his removal as Dean.  See CBA, Article 22 "Grievance Procedure," Exhibit "T," see also (a) Step I Grievance Decision, dated June 12, 1995, Bates Stamp Nos. 0396-0397; (b) Step II Grievance Decision, dated June 21, 1995, Bates Stamp Nos. 0398-0401; and (c) Step III Grievance Decision, dated November 7, 1995, Bates Stamp Nos. 0447-0448, ("Grievance Decisions") all as Exhibit "S."

37.     The removal was affirmed at each step of the grievance process.  Id.

**D.     Plaintiff's History at the BOE: MLKHS – September, 1995, through June, 1996.**

38.     On or about July 27, 1995, the BOE renewed plaintiff's PPT certificate which authorized him to teach bi-lingual social studies in BOE day high schools from September 5, 1995, through August 31, 1996.  See PPT Certificate, dated July 27, 1995, Bates Stamp No. 1159, Exhibit "N."

39.     Plaintiff was a regular substitute teacher of bi-lingual social studies at MLKHS during the 1995-96 school year.  Plaintiff no longer served as a Dean at MLKHS.  See Pl. 10/5/05 Dep., Exhibit "F," at 141:12-141:20.

40.     On or about April 17, 1996, plaintiff received a letter from Principal Ferrandino based on plaintiff's "pattern of unprofessional behavior and insubordination" which resulted in plaintiff's removal from Principal Ferrandino's office by security officers. See letter, dated April 17, 1996, Exhibit "U."

**E.     Plaintiff's History at the BOE: Graphics Communication Arts High School, September 1996 - June 1997.**

**(a) Background.**

- 10 -

41.     On or about August 8, 1996, the BOE renewed plaintiff's PPT certificate which authorized him to teach bi-lingual social studies in BOE day high schools from September 3, 1996 through August 31, 1997. <u>See</u> PPT Certificate, dated August 8, 1996, Bates Stamp No. 1158, Exhibit "N."

42.     On or about September 10, 1996, plaintiff was transferred to Graphics Communication Arts High School (M625) ("GCAHS") in Manhattan, New York.  <u>See</u> Pl. 2009 Dep., Exhibit "F" at 27:19-27:22; <u>see also</u> Kicinski Decl., Exhibit "E" ¶¶  6; <u>see also</u> Personnel Transaction Form ("PTF"), dated September 5, 1996 Exhibit "V."

43.     Stanley Turetsky ("Principal Turetsky") was the principal of GCAHS during plaintiff's employment at the school. <u>See</u> <u>generally</u> Turetsky Dep., Exhibit "W."

44.     Plaintiff was a regular substitute teacher bi-lingual social students at GCAHS during the 1996-97 school year.  <u>See</u> <u>generally</u> PFT, Exhibit "V,"; <u>see also</u> Turetsky Dep., Exhibit "W," at 23:16-24:14; 39:20-40:15.

**(b) Plaintiff's Work Performance at GCAHS.**

45.     Plaintiff's classes were observed on five occasions by Assistant Principal Frank Brancato ("AP Brancato") and once by Principal Turetsky during the 1996-97 school year. <u>See</u> (a) Observation Report, conducted on October 3, 1996 Bates Stamp Nos. 000470-000471; (b) Joint Observation Report, conducted on November 15, 1996, Bates Stamp Nos. 000461-000462; (c) Principal Turetsky Observation Report, dated November 21, 1996, Bates Stamp No. 000463; (d) Observation Report, conducted on March 11, 1997, Bates Stamp Nos. 000470-000471; (e) Observation Report, conducted on April 16, 1997, Bates Stamp Nos. 000466-000467; and (f) Observation Report, conducted on May 15, 1997, Bates Stamp Nos. 000464-000465, ("GCAHS Observations"), all as Exhibit "X."

46.     The observations were conducted pursuant to BOE teacher performance assessment procedures which required that untenured teachers be observed in the classroom at least four times to evaluate their performance.  See (1) BOE Handbook "Rating Pedagogical Staff Members," Bates Stamp Nos. RB2351-RB2368;  (2) High School Memorandum No. 28, "Supervisory Practices," Bates Stamp Nos. RB2424-RB2426; and (3) BOE Handbook "The Appeal Process," Bates Stamp Nos. RB2391-RB2423, ("Performance Assessment Procedures") all as "Y,"; see also See Turetsky Dep., Exhibit "W," at 46:20-47:14; 50:20-52:8; 56:21-57:15; see also Deposition of Joanne Frank, taken on November 19, 2009, ("Frank 2009 Dep."), Exhibit "Z," at 42:6-42:13; 58:7-59:24; 94:4-94:18; Deposition of Joanne Frank, taken on April 26, 2006, ("Frank 2006 Dep."), Exhibit "AA," at 41:20-42:12; 45:12-46:27; 51:19-53:24; 65:10-66:24; CBA, Article 8, "Education Reform," Exhibit "T."

47.     The purpose of the classroom observation is to provide support for teachers who exhibit pedagogical weaknesses and to promote pedagogical strengths.  See id., BOE Handbook "Rating Pedagogical Staff Members," Bates Stamp Nos. RB2362-RB2365; High School Memorandum No. 28, "Supervisory Practices," Bates Stamp Nos. RB2424-RB2426;

48.     The formal observation process generally entailed: (a) a discussion between the teacher and his supervisor before the observation, (b) a formal observation of the teacher's performance for one class period; (c) a post-observation conference where both parties are required to engage in a discussion regarding the teacher's performance; and (d) a post-observation report documenting the conference. See id; see also Frank 2009 Dep., Exhibit "Z," at 42:6-42:13; 58:7-59:24; 94:4-94:18; Frank 2006 Dep., Exhibit "AA," at 41:20-42:12; 45:12-46:27; 51:19-53:24; 65:10-66:24.

49.     In the report of the October 3, 1996, observation of plaintiff's 6th period bi-lingual Global Studies class, AP Brancato noted that plaintiff was teaching without a lesson plan.  A lesson plan is required by the Chancellor's regulations and the UFT contract.  See Observation Report, Bates Stamp Nos. 000470-000471, Exhibit "X;" see also CBA, Article 8, "Education Reform," "T."

50.     In his report of the November 15, 1996 joint observation conducted of plaintiff's 4th period bi-lingual Global Studies class, AP Brancato records that plaintiff refused to make any attempt at improvement. . See id. Joint Observation Report, Bates Stamp Nos. 000461-000462.  Specifically, AP Brancato noted

> When our discussion moved to recommendations for improvement, you indicated you had none.

Id.

51.     Principal Turetsky recommended that plaintiff use more English in class because the purpose of bi-lingual education is to teach English as well as the content of the class.  See id. Principal Turetsky Observation Report, Bates Stamp No. 000463.

52.     Plaintiff summarily rejected Principal Turetsky's suggestion for improvement. Id.

53.     In his report of the March 11, 1997 observation of plaintiff's 7th period bi-lingual class, A.P. Brancato noted, once again, that plaintiff refused to suggest any way that he could improve his teaching:

> When our discussion moved to suggestions for improvement, you found none to make.

See id. Observation Report, Bates Stamp Nos. 000470-000471.  This is precisely the same as the note for the November 15, 1996 observation.

54.     AP Brancato issued suggestions for improvement.  Id.

- 13 -

55.     These suggestions were summarily rejected by plaintiff.  Id.

56.     A.P. Brancato also noted plaintiff's poor grammatical skills:

> Finally, I asked that you proofread material before distributing it to students. Among the vocabulary words were the days of the week, in English, all in lower case. . .The days of the week are proper nouns and require capitalization. Overlooking such technical rules of English is a bad example for students and should be avoided in the future.

Id.

57.     In summarizing plaintiff's performance for the 1996-97 school year, Principal Turetsky testified:

> I was concerned in the time I supervised him **about [his] unwillingness to accept suggestions**. . .there was a reluctance to be better. . .for me as a principal, self-growth is critical for a new teacher.

See Turetsky Dep., Exhibit "W," at 46:20-47:14; 50:20-52:8; 56:21-57:15 (emphasis added).

58.     Nevertheless, on or about June 23, 1997, Principal Turetsky issued plaintiff a satisfactory annual performance Evaluation. See Annual Professional Performance Review and Report on Probationary Service of Pedagogical Employee, dated June 23, 1997, Bates Stamp No. 1141, which is annexed hereto Exhibit "BB."

**F.     Certification, Licensure and Appointment Process In 1997.**

59.     On or about February 1, 1997, plaintiff received a "Certificate of Qualification" from the New York State Education Department ("SED") certifying that he had met the minimum academic and professional state preparation requirements to teach social studies in grades "7-12."  See Certificate of Qualification, effective February 1, 1997, Exhibit "CC,"; see also Chancellor's Regulation, C-200(12), Exhibit "H."

60.     Obtaining a certificate of qualification was one prerequisite to the receipt of a conditional teaching license ("regular license") from the BOE.  See Chancellor's Regulation C-205(1), (9) Exhibit "H,"; see also Chancellor's Regulation, C-200, (11), (12), (18); Campbell Dep., Exhibit "D," at 6:7-7:10.

61.     To receive a conditional license from the BOE, plaintiff was required to file an application and take an oral examination administered by the BOE Office of Recruitment Personnel Assessment and Licensing ("ORPAL").  See Chancellor's Regulation C-205, (1), Exhibit "H,"; see also Campbell Dep., Exhibit "D," at 7:21-8:17.

62.     On or about April 7, 1997, plaintiff filed an application with the BOE seeking two conditional licenses to teach bi-lingual social studies in New York City Junior High and High Schools.  See Application for Pedagogical License or Certificate, signed by plaintiff on April 7, 1997, Bates Stamp Nos. RB2813-RB2815, ("Junior High School License Application"), RB2685-RB2687, ("High School License Application"),  as Exhibit "DD."

63.     On or about May 17, 1997, plaintiff received a Certified Provisional Teaching ("CPT") certificate from the BOE. See CPT certificate, dated May 17, 1997, Bates Stamp No. 1157, Exhibit "EE."

64.     The terms and conditions of CPTs are regulated by: (a) Article V of the collective bargaining agreement between plaintiff's union, the United Federation of Teachers ("UFT"), and the BOE and; (b) Chancellor's Regulation C-200. See CBA, Article 5 (C),(1), Exhibit "O,"; see also Chancellor's Reg. C-200(26),(b), Exhibit "H."

65.     On or about July 2, 1997, the BOE issued plaintiff two conditional teaching licenses authorizing plaintiff to teach bi-lingual social studies in New York City Junior

and High Schools. See Conditional Licenses,  as Exhibit "FF,'; see also  Kicinski Dec., Exhibit

"E," ¶ 4; see also Chancellor's Regulation, C-205,(1), (6) Exhibit "H."

66.    Possession of a conditional license is a pre-requisite for placement on a

"list of prospective appointees" which consisted of individuals eligible to receive to a

probationary teaching position with the BOE. See Chancellor's Regulations C-205, (6); C-200,

(3),(14),(15), C-201(5), Exhibit "H."; Campbell Dep., Exhibit "D," at 10-20.

67.    Pedagogues placed on the list were called by the BOE Division of Human

Resources to appear at a "Placement Center." See Campbell Dep., Exhibit "D," at 17:25-19:11;

26:13-27:24.; see also (a) Sample BOE Division of Human Resources Form Letter, dated May 7,

1997, ("Placement Center Invitation Letter") Bates Stamp No. RB2678-RB2679; and (b)

Schedule of Placement Centers for July, 1997, Exhibit "GG."

68.    At the placement centers, pedagogues would receive personnel transaction

forms ("PTFs") which referred them to "hiring halls" held at various school districts with

potential vacancies for appointments or assignments. See Campbell Dep., Exhibit "D," at 17:25-

19:11; 26:13-27:24.

69.    Teachers were informed that all referrals for appointed positions were

conditioned on the existence of a vacancy and an interview by a district representative or by a

school representative. Id.; see also Schedule of Placement Centers for July, 1997, Exhibit "GG."

70.    Absent the existence of a vacancy for an appointed position, a teacher

possessing CPT and regular city licenses could serve as a regular substitute teacher prior to

obtaining an appointment to a tenure track appointed position.  See Chancellor's Regulation, C-

205, (19), Exhibit "H,"; see also id. Chancellor's Regulation, C-200, (18), (26).

71.     In the summer of 1997, plaintiff was notified by the BOE Division of Human Resources to report to a placement center scheduled for July 23, 1997. <u>See</u> <u>generally</u> Exhibit "GG."; <u>see</u> <u>also</u> Letter from the Manhattan High School Superintendency, District 71, dated July 23, 1997, ("Hiring Hall Invitation Letter"), Exhibit "HH."; <u>see</u> <u>also</u> Pl. 2009 Dep., Exhibit "G," at 38:7-42:20; 44-50.

72.     Plaintiff testified that, at the placement center, he was referred to a hiring hall held by the Manhattan High Schools, District 71, scheduled for August 28, 1997. <u>See</u> Hiring Hall Invitation Letter, Exhibit "HH."

73.     Plaintiff testified that, based on the July 23, 1997 letter, that he understood that all referrals for interviews at the August 28th hiring hall for appointed positions were conditioned on the existence of a vacancy.  <u>See</u> Pl. 2009 Dep., Exhibit "G," at 39:25-40:14; 44:17-45:11.

74.     Specifically, plaintiff testified as follows:

> Q: The last sentence of that first paragraph says: "All referrals are conditional upon budgetary constraints and an interview."  What did you take that to mean at the time?
>
> A:. . . It means that **if there is a position available at the time**.
>
> Q: If there was a position available at the time then you would be appointed; correct?
>
> A: I believe so, yes.

<u>Id.</u> at 44-45.

75.     Plaintiff testified that he understood that he was not an appointed teacher as of April 7, 1997, and July 25, 1997.  <u>See</u> Pl. Dep., Exhibit "G," at 35:8-35:14; 45:12-45:18.

76. Plaintiff testified that at the hiring hall he was referred for an interview at Art & Design High School but was later informed that no vacancy existed for an appointed position at the school. See Pl. 10/11/05 Dep., Exhibit "F," at 7:8-8:11.

77. Plaintiff testified that, at the July 23rd placement center, he also received one personnel transaction form, which referred him for an interview for an appointed teaching position in Junior High School District 3. See Pl. 2009 Dep., Exhibit "G," at 45:15-51:9; see also personnel transaction form, signed by the plaintiff on July 23, 1997, Bates Stamp 000860R, Exhibit "II."

78. Plaintiff testified that that it was his understanding that to receive the position he would have to be released from his assignment at GCAHS. See Pl. 2009 Dep., Exhibit "G," at 46:3-46:7; 48;19-48:21.

79. The personnel transaction form referring him to the Junior High School position indicated that the position was "subject to release from [plaintiff's] current position [in] district (71)." See personnel transaction form, signed by the plaintiff on July 23, 1997, Bates Stamp 000860R, Exhibit "LL."

80. At his 2009 deposition, plaintiff testified that he had been actively seeking a position at another school and that he had requested to be released from GCAHS. See Pl 2009 Dep., Exhibit "G," at 49-56.

81. Plaintiff testified that he asked the Superintendant of Manhattan HS Granger Ward to be released from his assignment at GCAHS. See Pl 2009 Dep., Exhibit "G," at 49-56.

82. On or about August 25, 1997, Principal Turetsky issued plaintiff a letter releasing him from his regular substitute teaching assignment at GCAHS and placing plaintiff in

the school's absent teacher reserve.  See Letter from Principal Turetsky, dated August 25, 1997, Exhibit "JJ,"; see also Turetsky Dep., Exhibit "W," at 59:15-61:5; 72; See letter from Plaintiff, dated September 3, 1997, Exhibit "KK."

83.    Plaintiff wrote Superintendant Ward a letter requesting that he be removed GCAHS and granted a regular substitute teaching position elsewhere.  Plaintiff wrote that, despite his satisfactory observation ratings at GCAHS, the school "became a hostile environment" for him. See letter from plaintiff to Superintendent Ward, dated September 3, 1997, Exhibit "KK."  Plaintiff concluded the letter:

> In light of the foregoing. . .I am requesting that the
> decision for me to be placed at Graphics be change
> [sic].

Id.

84.    Plaintiff never filed a grievance challenging his release from GCAHS. See CBA, Article 22, Exhibit "T."

85.    Plaintiff was ultimately assigned to a substitute teaching position at Seward Park High School as a Certified Provisional Teacher, a CPT.  Plaintiff initially refused the position at Seward Park and at the Junior High School and sought employment at George Washington High School ("GWHS") apparently believing that the school had a vacancy for a full time appointed High School teacher of bi-lingual social studies.  See (a) letter from Superintendent Ward to plaintiff, dated September 5, 1997, Bates Stamp No. 000277; (b) letter from Seward Park High School Principal Jerrold Stoopack to plaintiff, dated September 10, 1997, Bates Stamp No. 000279; and (c) letter from plaintiff to the UFT, dated September 7, 1997, Bates Stamp No. 5050; ("Seward Park Assignment Documents"), Exhibit "LL."

86.     However no vacancy existed and plaintiff was offered a teaching assignment as a per-diem substitute teacher at GWHS. See id. GWHS "Procedures for Per Diem Substitutes," dated September 10, 1997, Bates Stamp Nos. 000294-000295, Exhibit "MM."

87.     Plaintiff subsequently consulted his union regarding the CPT position at Seward Park High School.  See letter from plaintiff to the UFT, dated September 7, 1997, Bates Stamp No. 5050, Exhibit "LL."

88.     On or about September 7, 1997, plaintiff wrote to the union summarizing their meeting and indicating that he would accept the CPT teaching assignment. Specifically, plaintiff indicated:

> I am willing to wait for my appointment as a full time bilingual social studies teacher. . .**I will comply with your order to report to Seward Park High School on Monday, September 8, 1997 and take the substitute position being offered.**

See id. (emphasis added).

89.     On or about September 10, 1997, plaintiff accepted a regular substitute teaching position as an un-appointed Certified Provisional Teacher, a CPT, at Seward Park High School (M445) ("Seward Park HS") Manhattan, New York. See personnel transaction form, signed by the plaintiff on September 10, 1997, Exhibit "NN;" see also Kicinski Decl., Exhibit "E," ¶ 6; see also Chancellor's Regulation, C-205, (19), C-200, (18), (26), Exhibit "H."

**G.     Plaintiff's History at the BOE: Seward Park High School, September 1997-January 1998.**

90.     Jerrold Stoopack ("Principal Stoopack") was the principal of Seward Park HS throughout plaintiff's employment at the school.  See Deposition of Principal Stoopack, taken on December 15, 2009, ("Stoopack Dep."), Exhibit "PP," at 8:1-8:17;

91.    Principal Stoopack testified that plaintiff had CPT status during his time at Seward Park. Id. at 30:1-30:21; 33:1-33:13; 58:10-58:16.

92.    Principal Stoopack that to be appointed on tenure track, a teacher would have to be appointed to the school based on a declared vacancy. Id. 71:11-71:19; 25:13-27:7

93.    Principal Stoopack testified that, based on his budget, he did not have a declared vacancy for a permanent appointed teacher of bi-lingual social studies at his school in September 1997. Id. 71:11-71:19;.

94.    Accordingly, plaintiff taught various courses, including bi-lingual social studies, at Seward Park HS as an un-appointed regular substitute teacher from September 10, 1997 until January 20, 1998. See Kicinski Decl., Exhibit "E," ¶ 6.; see Stoopack Dep., 50:22-51:2

95.    Victor Acevedo also taught various courses, including bi-lingual social studies, as an un-appointed regular substitute at Seward Park during the fall, 1997, semester. Mr. Acevedo began teaching at the school nine (9) years earlier, on September 6, 1988.   See HRS Service History Report for Victor Acevedo, Bates Stamp No. RB2695-RB2696, Exhibit "QQ,"; see also Stoopack Dep., Exhibit "PP" at 46-47.

96.    Plaintiff's classes were observed by the Assistant Principal, Geoffrey Cabat ("AP Cabat"), on three (3) occasions during his employment at Seward Park.   See Observation Report, dated September 18, 1997, Bates Stamp Nos. 000476-000477; Observation Report, dated December 3, 1997, Bates Stamp Nos. 000474-00475; Observation Report, dated January 9, 1998, Bates Stamp Nos. 00472-000473, ("Seward Park Observations"), collectively Exhibit "OO,"

97.     While plaintiff's observations during his time at Seward Park were generally rated satisfactory, the reports revealed that plaintiff suffered from the same performance deficiencies that were reported at GCAHS. For example, AP Cabat noted plaintiff's penchant for lecture, failure to give student writing assignments, and failure to incorporate BOE materials into his lessons.

98.     On or about December 21, 1997, the *New York Post* printed a newspaper article relating to allegations that a DOE high school was falsifying attendance records.  The article paper quoted plaintiff in connection with his allegations of falsified attendance records at MLKHS.  See First Amended Complaint, Exhibit "A," at ¶¶ "65"-"66."

99.     On or about January 20, 1998, plaintiff was notified that by Assistant Principal Jayne Godlewski ("AP Godlewski") that, pursuant to Article 17 of the CBA, she was required

> . . .to inform all non-appointed staff of the possibility that we may be unable to offer you a position for the spring 1998 semester. Once we receive our allocations for the spring term, we will make a final determination.

See (a) Letter from AP Godlewski, dated January 20, 1998, Bates Stamp No. 000255; (b) Step I Grievance Decision, dated February 2, 1998, Bates Stamp No. 000253; (d) HRS Service History Report for Victor Acevedo, Bates Stamp No. RB2695-RB2696, ("Seward Park Excess Documents") Exhibit "QQ,"; Pl. HRS Service History List Report, Exhibit "C,";  see also CBA, Article 17, Exhibit "T."

100.    Plaintiff was excessed from his position at Seward Park High School based on a reduction in the school's budget for the spring term.  Id.

101.    Based on his seniority, Victor Acevedo was retained at Seward Park HS as the sole teacher of bi-lingual social studies.  Id.

102.     Plaintiff subsequently filed a Step I grievance that was denied.  See Step I Grievance Decision, dated February 2, 1998, Exhibit "QQ," see also Stoopack Dep., Exhibit "PP," at 46:13-47:17; 66:14-66:21.

103.     Plaintiff did not file a Step II or Step III grievance concerning the excessing of his position at Seward Park. See CBA, Article 22, Exhibit "T."

**H.     Norman Thomas High School, February, 1998-January, 1999.**

104.     Pursuant to Article 17 of the CBA, because plaintiff was excessed from his position at Seward Park, he was entitled for priority assignment to an "unencumbered" vacancy within the school district. See CBA, Article 17(A)(3), Exhibit "T."

105.     On February 2, 1998, plaintiff was assigned to an appointed probationary teaching position at Norman Thomas High School ("NTHS") (school code M620) as a bilingual social studies Spanish teacher.  See Kicinksi Decl., Exhibit "E," ¶ 6; see also HRS List Report, Exhibit "C,"; see also (a) PTF, signed by plaintiff on January 30, 1998, Bates Stamp No. 000358; (b) "Finalized" PTF, printed February 10, 1998, Bates Stamp No. 000350; (c) BOE Report "Pedagogues Who Are Currently On Probation – All Manhattan High Schools," Bates Stamp No. 0262; (d) Letter from Marilyn Scher to Vicente Blum, dated June 5, 1998, Bates Stamp No. RB2427 ("Appointment Documents"),  as Exhibit "RR."

106.     Joanne Frank ("Principal Frank") was the principal of NTHS during plaintiff's employment at the school. See Frank 2006 Dep., Exhibit "AA," at 9:22-24; 16:13-16:19.

107.     Nelson Acevedo ("AP Acevedo") was the Assistant Principal of the Social Studies Department at NTHS during plaintiff's employment at the school.  See id. at 19:10

108.    Plaintiff testified that upon his arrival at NTHS, plaintiff learned that the position he would be occupying was not an "unencumbered position."   See Pl. 2009 Dep., Exhibit "G," at 68:25-69:4.

109.    In fact, the position was made vacant by teacher Vicente Blum who had taken an assignment at the BOE Pre-Employability Skills Center for the spring 1998 Semester. Pursuant to Article 11 of the CBA, Vicente Blum had a right of return to his former position at NTHS. See Frank 2009 Dep., Ex. "AA," at 6:8-10:16; 26:10-27:24; see also Letter from Marilyn Scher, dated June 5, 1998, Bates Stamp No. RB2427, Exhibit "RR."

110.    Plaintiff testified that he understood that he would be occupying the position made vacant by Vicente Blum at NTHS in the spring 1998 semester.   See Pl. 2009 Dep., Exhibit "G," at 68:25-69:4.

111.    Principal Frank testified that she had an increase in her student registry and school budget, accordingly she kept plaintiff on her staff after Mr. Blum returned to occupy his former position in the Fall of 1998. See Frank 2009 Dep., Exhibit "Z" at 26:10-27:24.

112.    Accordingly, plaintiff taught bi-lingual social studies as a conditionally appointed probationary teacher at NTHS, from February 2, 1998, to January 15, 1999, and terminated February 1, 1999.  See Kicinski Decl., Exhibit E, ¶ 6; see also HRS List Report, Exhibit "C."

113.    Based on his prior substitute service, plaintiff had earned two years of "Jarema" credit towards the completion of the three-year probationary period See Chancellor's Regulation, C-200,(3), Exhibit "H,"; see also BOE Report "Pedagogues Who Are Currently On Probation – All Manhattan High Schools," Bates Stamp No. 0262; Frank 2009 Dep., Exhibit "Z," at 29:21-30:40; 34:10-16; see also N.Y. Educ. Law § 2509(1)(a).

114.   Accordingly, plaintiff's appointment was subject to the completion of one year of <u>satisfactory</u> probationary service at NTHS.  <u>See generally</u> <u>id.</u>

115.   Based on his February 2, 1998 appointment date, plaintiff was scheduled to earn tenure on February 2, 1999. <u>see also</u> BOE Report "Pedagogues Who Are Currently On Probation – All Manhattan High Schools," Bates Stamp No. 0262; Frank 2009 Dep., Exhibit "Z," at 29:21-30:40; 34:10-16; <u>see also</u> N.Y. Educ. Law § 2509(1)(a).

116.   While plaintiff was assigned to NTHS, Principal Frank was not aware of plaintiff's prior record at other schools.  <u>See</u> Frank 2006 Dep., Exhibit "AA," at 16:13-16:19; 34:5-34:23; 39:2-39:25; <u>see also</u> Frank 2009 Dep., Exhibit "Z," 13:16-18.

**I.     Plaintiff's Work Performance At NTHS.**

117.   During his employment at NTHS, plaintiff's classes were observed on several occasions. <u>See</u> (a) Observation Report, for observation conducted on March 2, 1998; (b) Observation Report, for observation conducted on April 27, 1998; (c) Observation Report, for observation conducted on October 8, 1998, Bates Stamp No. 1107-1108; (d) Observation Report, for observation conducted on October 20, 1998, Bates Stamp No. 1109-1111; (e) Observation Report, for observation conducted on November 16, 1998, Bates Stamp Nos. 1112-1113; (f) Observation Report, for observation conducted on December 11, 1998, Bates Stamp Nos. 1114-1116; and (g) Observation Report, for observation conducted by Superintendent Designee, James Costaras, on December 17, 1998, Bates Stamp No. 1070-1076, ("NTHS Observation Reports"), all  as Exhibit "SS."

118.   Plaintiff's observations during his time at NTHS revealed that plaintiff suffered from the same performance deficiencies that were reported at GCAHS and Seward Park.

119.    In his report of the March 2, 1997 observation of plaintiff's Global Studies IV (Bilingual) lesson AP Acevedo noted "there was very little use of English in the lesson." See Observation Report, for observation conducted on March 2, 1998, Exhibit "SS."

120.    AP Acevedo also noted plaintiff's failure to use visual aides during his lesson as well as his failure incorporate both a reading and writing component into daily homework assignments. Id. AP Acevedo warned plaintiff that:

> On my next visit, I expect to see the suggestions in this report incorporated in your lessons.   Please keep in mind that failure to incorporate the use of English into a bilingual subject area course may lead   to   an   unsatisfactory   rating,   per Superintendent's directive.

See Id.

 This is precisely the same observation suggestion that plaintiff received previously at GCAHS. Although there were deficiencies, the lesson was rated satisfactory by AP Acevedo and that decision was approved by Principal Frank.  See id.

121.    On April 27, 1998, A.P. Acevedo, conducted an observation of plaintiff's Global Studies (Bilingual) lesson where he once again noted plaintiff's failure to use visual aides in his lessons as well as his failure incorporate both a reading and writing component into daily homework assignments. See Observation Report, for observation conducted on April 27, 1998, Exhibit "SS."

122.    Again, although there were deficiencies, the lesson was rated satisfactory by AP  Acevedo and approved by Principal Frank.  See Id.

123.    Despite his shortcomings during the spring, 1998, semester, Principal Frank issued plaintiff a "satisfactory" annual evaluation rating.  See Evaluation, dated June 26, 1998, Bates Stamp Nos. 1006-1007; Evaluation, dated January 28, 1999, Exhibit "TT."

124.   Pursuant to BOE regulations, although plaintiff had only been at NTHS for the spring 1998 semester, Principal Frank issued plaintiff a satisfactory rating for the 1997-98 school year <u>See</u> Rating Pedagogical Staff Members, Exhibit "Y," at RB2359; <u>see also</u> Frank 2009 Dep., Exhibit "Z," at 28:1-29:25.

125.   Pursuant to BOE regulations, Principal Frank recommended that plaintiff continue his one year probationary period at NTHS and forwarded a copy of the June 1998 evaluation to the Superintendent's Office for his files. <u>See</u> Evaluation, dated June 26, 1998, Bates Stamp Nos. 1006-1007, Exhibit "TT"; <u>see also</u> Frank 2009 Dep., Exhibit "Z," at 28:10-28:24; Deposition of former Director of BOE Office of Appeals and Reviews, Robert Reich, taken on November 18, 2009, ("Reich Dep."), Exhibit "UU,"; Rating Pedagogical Staff Members, Exhibit "Y," at RB2368.

126.   On or about June 26, 1998, Principal Frank's payroll secretary attempted to give plaintiff the evaluation report, which he refused to accept. <u>See</u> Evaluation, dated June 26, 1998, Bates Stamp Nos. 1006-1007, Exhibit "TT."  Pursuant to BOE regulations, the Principal signed the form indicating his refusal to accept the form and placed it in plaintiff's personnel file. <u>See</u> Rating Pedagogical Staff Members, Exhibit "Y," at RB2359; Rating Pedagogical Staff Members, Exhibit "FF," at 2366 (§ 2,C).

127.   Plaintiff returned to NTHS in the fall of 1998. <u>See</u> Frank 2009 Dep., Exhibit "Z" at 26:10-27:24.

128.   On October 9, 1998, AP Acevedo and Principal Frank conducted a classroom observation of plaintiff's Global History 1 (Bilingual) lesson.  <u>See</u> Observation Report, for observation conducted on October 8, 1998, Bates Stamp No. 1107-1108, Exhibit "SS."

129.    The lesson was rated unsatisfactory.  Id.

130.    The post-observation report contained several criticisms and seven recommendations for improvement in plaintiff's performance.  Id; see also Frank 2006 Dep., Exhibit "AA," 59:17-60:25; 63:11-65:8.

131.    AP Acevedo and Principal Frank noted that:

> **There was no English used in the lesson** (written or oral).  This is a bilingual class where all students were required to take the Regents examination next year in English…The absence of English in your lesson was discussed with you in a prior observation conference.
>
> ***
>
> This lesson does not appear in the new Global History curriculum.  During the pre-observation conference, I provided you with a calendar of lessons which follows the New York State guidelines.  It is expected that you will follow the guidelines in future lessons.
>
> ***
>
> There was no homework given to your students.

See  Observation Report, for observation conducted on October 8, 1998, (emphasis supplied), Bates Stamp No. 1107-1108, Exhibit "SS."

132.     AP Acevedo also noted that plaintiff rejected all the suggestions that were given to him and in the post-observation conference, refused to provide suggestions for improvement:

> At our post-observation conference you indicated that your lesson had been excellent …when asked to supply examples…you indicated that you would rather not give any examples. . . You indicated that you were not going to participate in the conference by answering questions about your lesson.

Id.

   133. Two weeks later, on October 21, 1998, Principal Frank and AP Acevedo observed plaintiff's Global History 1 (Bilingual) lesson. <u>See</u> Observation Report, for observation conducted on October 21, 1998, Bates Stamp Nos. 1109-1111, Exhibit "SS."

   134. Once again, the report of the observation noted many criticisms of the lesson. For example, A.P. Acevedo noted

> **You did not have a written lesson plan.** A written lesson plan is a contractual requirement…
>
>       * * *
>
> There was no visual[] aid in the lesson so as to properly motivate students. . .
>
>       * * *
>
> **The use of English was extremely limited in this lesson** . . .

Id. (emphasis added).

   135. Once again, AP Acevedo noted in the post observation conference plaintiff's unwillingness to assist in improving plaintiff's performance:

> At our post observation conference you indicated that your lesson was satisfactory in every way. This was the extent of your participation. You demonstrated an unwillingness to collaborate on ways of improving your performance.

Id.

   136. Plaintiff's lesson was rated "unsatisfactory" and he was warned that his failure to incorporate the recommendations set forth in the report could lead to the termination of plaintiff's probation. Id.

   137. Four weeks later, on November 16, 1998, Principal Frank and AP Acevedo again observed plaintiff's U.S. History and Government II (Bilingual) lesson. <u>See</u>

Observation Report, for observation conducted on November 16, 1998, Bates Stamp Nos. 1112-

1113, Exhibit "SS."

138.    Once again, the report of the observation noted many criticisms of the

lesson which has appeared in prior observations of plaintiff's teaching.  Id.  Specifically, A.P

Acevedo noted

> There were many spelling and grammatical errors in
> English throughout the lesson…
>
> There was no reading component in the
> homework…
>
> Your written lesson plan was not well organized.
> When asked for a written lesson plan by Ms. Frank
> you turned to two pages in your notebook and
> Xeroxed them and then removed scissors and scotch
> tape from your jacket pocket and cut and taped the
> lesson plan together. . .and provided us with the
> copy.

Id.

139.    AP Acevedo also noted plaintiff's failure, for the third time in the

semester, to participate actively in the post-observation conference

> When asked to share your impression of the lesson
> you said, 'It was a very good lesson." You were
> asked to share the ways in which this was so and
> you responded, 'I can't give any examples'. . .

140.    AP Acevedo concluded

> **There are serious concerns about your**
> **proficiency in English and the impact that this**
> **has on preparing students for the Regents**
> **examinations that they will have to take in**
> **English.**  It is apparent that you must take the time
> to be certain that your presentation in English is
> flawless and that our students model you.
>
> The lesson was unsatisfactory.  Both of us have
> observed you three times this semester and have

> seen no improvement. You are to continue to meet
> Mr. Acevedo on a weekly basis to assist you in
> developing your lesson plans and improving your
> instructional techniques.  **Failure to improve can
> lead to an extension or termination of
> probationary service**.

Id. (emphasis supplied)

141.    Nearly four weeks later, on December 11, 1998, Principal Frank and A.P.
Acevedo observed plaintiff's U.S. History and Government II (Bilingual) lesson.   See
Observation Report, for observation conducted on December 11, 1998, Bates Stamp Nos. 1114-
1116 Exhibit "SS."  This was the fourth observation during the Fall of 1998.

142.    Once again, the report of the observation noted many of the same
criticisms of the lesson that were noted in the previous observation reports.  Id

143.    A.P. Acevedo noted that:

> The lesson was unsatisfactory.  You have failed to
> adequately improve in your instruction.  **You are
> not following the course syllabus as directed in a
> post-observation report.  Your written English is
> still poor as discussed in a post-observation
> report.**  During our post-observation conference, it
> was suggested that you work on improving your
> English language skills by using a computer
> software program designed for this purpose.  You
> agreed that this was a good idea.  We will look to
> see improvement in your use of the English
> language…
>
> **Failure to improve may result in an
> unsatisfactory rating and/or discontinuance of
> your probationary period**.

Id. (emphasis supplied).

144.    In 1998, BOE procedure required that a representative from the
Superintendent's office observe a probationary teacher in danger of being terminated.   See
Rating Pedagogical Staff Members, Exhibit "Y," at RB2357-RB2358.

145.    At the request of Principal Frank, James Costaras, from Superintendent Ward's office, came to NTHS to observe plaintiff's December 17, 1998 lesson.  See Observation Report, for observation conducted by Superintendent Designee, James Costaras, on December 17, 1998, Bates Stamp No. 1070-1076, Exhibit "SS."

146.    In a report, dated December 30, 1998, Mr. Costaras rated the lesson unsatisfactory for several reasons including, poor planning, poor questioning techniques/poor student participation, poor classroom routines, and a failure to assess student learning.  Mr. Costaras also noted deficiencies in plaintiff's written English.  Id.

147.    In his observation report, Mr. Costaras stated that:

> As a result of this unsatisfactory lesson, I shall recommend to Mr. Granger B. Ward, Superintendent, that he support Ms. Frank's request for an unsatisfactory rating and for discontinuance of your probationary service if she so decides.

Id.

## J.    Reasons For Plaintiff's Termination.

148.    Pursuant to the BOE By-Laws and Chancellor's Regulations, the BOE's Office of Appeals and Review ("OAR") is charged with conducting appeals hearings concerning unsatisfactory evaluation ratings and the denial or discontinuance of probationary employment. See Reich Dep., Exhibit "UU" at 7:5-7:25; see also BOE Handbook "The Appeal Process," Bates Stamp Nos. RB2406-RB2423, Exhibit "Y."

149.    In cases where it appeared that an employee's probationary services may have to be discontinued, OAR was also charged with convening Technical Assistance Conferences ("TAC") to review whether sufficient documentary evidence supported a discontinuance of the teacher's probationary service.  See BOE Handbook "The Appeal Process," Bates Stamp Nos. RB2410, Exhibit "Y."

150.    Based on Superintendant Ward's recommendation, Principal Frank met with the Director of the BOE's Office of Appeals ("OAR"), Robert Reich, to review the material in plaintiff's probationary teacher file.

151.    On or about January 7, 1999, Principal Frank participated in a TAC where the Principal was informed that, based on plaintiff's unsatisfactory performance at NTHS, sufficient evidence existed to rate plaintiff unsatisfactory and to recommend denial of completion of probation. See (a) Letter to Principal Frank from Robert Reich, dated January 7, 1999; (b) Letter from Superintendant Ward, dated January 9, 1999; (c) Letter from Chancellor Rudolph F. Crew to the plaintiff, dated January 15, 1999; (d) Letter to Superintendant Ward from Principal Frank, dated January 11, 1999; (e) LIF, dated January 12, 1999, Bates Stamp No. 1124; (f) Letter from Principal Frank to the plaintiff, dated February 1, 1999, Bates Stamp No. 0993; (g) Letter from Principal Frank to the plaintiff, dated February 1, 1999, Bates Stamp No. 0992; ("Termination Documents"), all  as Exhibit "VV."

152.    Superintendant Ward wrote to Dr. Margaret Harrington of the BOE Chancellor's Office, requesting the denial of completion of plaintiff's probationary service.  See Letter from Superintendant Ward to Dr. Harrington, dated January 9, 1999, Exhibit "VV."

153.    By letter to Superintendent Ward, dated January 11, 1998, Principal Frank summarized her reasons for the recommendation for the denial of certification of completion of probation of the plaintiff:

> [Plaintiff] is not proficient in the use of standard English.  He has demonstrated an inability to construct sentences that are grammatically correct, contain correct punctuation, and free of spelling errors.
>
> Mr. Brenes has resisted the assistance of his immediate supervisor in improving his professional development, and had noted in front of the UFT

representative that the Assistant Principal knows
nothing about social studies.

Lesson planning is either insufficient or non-
existent.  The lessons observed are characterized by
poor planning, preparation and development.  Mr.
Brenes has demonstrated an inability to follow
curriculum and calendar of lessons which were
provided to him.  The instructional needs of the
bilingual students are not addressed in terms of
development of their linguistic skills.  Suggested
methodology for teaching bilingual students has not
been demonstrated.

[Plaintiff] has not been able to form and maintain
good relationships with supervisors, teachers and
students.  His posture is one of arrogance and
intimidation.  He has consistently demonstrated a
lack of professionalism towards any form of
authority.

[Plaintiff] has not taken the necessary steps to
correct his deficiencies.

<u>See</u> letter to Superintendant Ward from Principal Frank, dated January 11, 1999, Exhibit "VV."

154.  Principal Frank issued plaintiff a letter to file based on an incident in
which a student volunteer at the school's Social Studies office alleged that she had been
badgered and intimidated by plaintiff.  <u>See</u> <u>id.</u> letter to file, dated January 12, 1999, Bates Stamp
No. 1124.

155.  In the letter to plaintiff and file, Principal Frank recounted that:

The student indicated that on December 22, 1998
you approached her in the Social Studies Office and
began questioning her about whether Mr. Acevedo
had come into the office with the Superintendent.
She indicated that you leaned over the desk and
placed your face very close to her face as you
repeatedly questioned her. The student indicated
that you kept asking her the same question over and
over and that when she indicted [sic] someone from
the office had come in you stopped questioning her.
A short time later when the student was standing

> you came up behind her and began asking questions
> again.  The student indicated that you made her feel
> very uncomfortable and that you were harassing
> her….
>
> I am directing that you cease and desist from
> engaging in behavior that results in a student feeling
> uncomfortable, intimidated or harassed.  Should you
> fail to heed my directive, severe disciplinary action
> will be taken which may result in denial of
> completion of probation and/or termination.

Id.

156.    By letter, dated January 15, 1999, DOE's Chancellor Crew advised

plaintiff that based on the recommendation of Superintendent Ward:

> [Y]our probationary service as a Bilingual Teacher
> of Social Studies at Norman Thomas High School is
> terminated as of the close of business on
> January 19, 1999. . .

See id. letter from Chancellor Rudolph F. Crew to the plaintiff, dated January 15, 1999; see also

Chancellor's Regulation C-200 (7), Exhibit "H."

157.    Based on the observations done during the fall 1998 semester, Principal

Frank issued plaintiff an evaluation report rating plaintiff's performance as "unsatisfactory."  See

Evaluation, signed by the plaintiff on January 29, 1999, Exhibit "TT."

158.    Education Law § 3012(1)(a) required that plaintiff receive a 60-day notice

of his denial of certification of completion of probation.  Accordingly, plaintiff was provided an

opportunity to work for an additional 60-day.  However, his status as a discontinued probationary

employee was not affected by this decision, it was simply an offer to change the effective date of

plaintiff's termination to provide 60 days of pay.  See letter from Principal Frank to plaintiff,

dated February 1, 1999, Bates Stamp No. 0993; Exhibit "VV,"; see also id. letter from Principal

Frank to plaintiff, dated February 1, 1999, Bates Stamp No. 0992,; Reich Dep., Exhibit "UU," 66:9-70:14; 126:13-127:4; Chancellor's Regulation C-31, Exhibit "H."

159.   By letter, dated February 1, 1999, Principal Frank provided plaintiff an assignment to be performed for the remainder of his time at NTHS.  See February 1, 1999 letter from Principal Frank. See letter from Principal Frank to plaintiff, dated February 1, 1999, Bates Stamp No. 0993; letter from Principal Frank to plaintiff, dated February 1, 1999, Bates Stamp No. 0992; ("Termination Documents"), Exhibit "VV,"; see also Reich Depo., Exhibit "UU," at 126:13-127:4.

160.   When plaintiff was presented with the February 1st letter and assignment, plaintiff became irate and refused to perform any of the assigned duties.  See letter from Principal Frank to plaintiff, dated February 1, 1999, Bates Stamp No. 0992, Exhibit "VV."

161.   For example, with respect to his refusal to perform the assignment, plaintiff testified at his deposition as follows:

> Q: Under number 4 of the [February 1st letter] it says [']assignment. You are to translate into Spanish the course curriculum, calendar of lessons, aims and write sample lesson or economics curriculum.['] Did you perform these duties as of February 1, 1999.
>
> A: No, I did not.

See Pl. 2009 Dep, Exhibit "G" at 87.

162.   Regarding plaintiff's reaction to the assignment, Principal Frank testified that plaintiff:

> [Flew] into a rage when he was given the assignment to translate social studies curriculum and lesson plans, where he became violent, screaming and yelling, he would not accept an assignment, and he was clearly, clearly out of

> control. And that is when I called for some guidance
> to deal with the situation.

<u>See</u> Frank 2009 Dep., Exhibit "Z," at 83:11-83:18.

163.   Indeed, throughout this period, plaintiff began to display violent outbursts that caused several administrators to write to the Superintendent seeking his removal from the school.  <u>See</u> letter from Lenza McSulla to Superintendent, dated January 28, 1999; letter from Carlotta Ruiz to Superintendent, dated January 28, 1999; letter from AP Acevedo to Superintendent, dated January 28, 1999; letter from Anthony Cordero to Superintendent, dated January 28, 1999, all as Exhibit "WW."

164.   With the approval of the Superintendent's office, by letter dated February 1, 1999, Principal Frank informed plaintiff that:

> Your refusal to perform this assignment is both insubordinate and disruptive to the orderly operation of the school.  **Accordingly, your denial of completion of probation will take effect immediately, close of business today February 1, 1999**.

<u>See</u> letter from Principal Frank to plaintiff, dated February 1, 1999, Bates Stamp No. 0992; ("Termination Documents"), "VV;" <u>see also</u> Step I Grievance Decision, dated February 26, 1999, Bates Stamp Nos. 0958; Step II Grievance Decision, dated March 24, 1999, Bates Stamp Nos. 00618-00619; Step III Grievance Decision, dated June 29, 1999, as Exhibit "XX."

165.   Plaintiff subsequently filed a Step I, II, and III grievance challenging both the termination determination and the denial of 60 day notice requirement.  <u>See generally</u> Exhibit "XX."

166.   Plaintiff's grievance was denied at every step.  Specifically, in its Step III decision, the Chancellor's representative noted:

> It is the opinion of the undersigned that the grievant forfeited any claim for additional compensation. If he thought the assignment [was] inappropriate he should have accepted it and then grieved it.

Id. Step III Grievance Decision, dated March 24, 1999, at Bates Stamp No. 00619.

**K.    Plaintiff's Internal BOE Appeals and State litigation.**

167.    Chancellor's Regulation C-31 provides that probationary employees who have been discontinued, or who have received an unsatisfactory rating, are entitled to a review of both the discontinuance and the unsatisfactory rating before a triparte committee. ("C-31 process").[7]   See Chancellor's Regulation C-31, Exhibit "H,"; see also "Appeal Process" Handbook, Exhibit "H," at RB2412-2415; BOE By-Law, Article 5, Exhibit "H."

168.    In pertinent part, C-31 provides that at the review the probationary employee is entitled to:

- be represented by an advocate

- present all relevant evidence;

- call witnesses in his/her behalf;

- cross-examine witnesses; and

- make an oral presentation.

See Chancellor's Regulation, C-31, Exhibit "H."

169.    In this case, the review of plaintiff's unsatisfactory rating and denial of completion of probation was scheduled for May 12, 1999.  One day before the hearing, plaintiff requested an adjournment through his UFT representative based on an alleged illness. Plaintiff was informed to provide a doctor's note by May 12, 1999. Plaintiff failed to provide a note by the hearing date. Accordingly, the committee deemed the case abandoned.  On or about May 17,

---

[7] By-law 5.3.4 has been renumbered as By-law 4.3.2

1999, Robert Reich wrote to plaintiff's union representative noting plaintiff's failure to appear at the May 12th hearing and indicating that "to date no physician's note has been received." Plaintiff subsequently provided the BOE with a doctor's note dated May 17, 1999. See "Notice to Appellant," dated March 16, 1999, Bates Stamp No. 0297; (b) Letter from UFT representative, Dan Acosta, dated May 11, 1999, Bates Stamp No. 0298; (c) Chancellor's Committee Decision, dated May 12, 1999, Bates Stamp No. 302; (d) Letter from Dr. Clarence Chen, dated May 14, 1999; and (e) Letter from Robert Reich, dated May 17, 1999, ("C-31 Process Documents"), all Exhibit "YY."

170.    On or about October 4, 1999, plaintiff received a letter from Howard J. Bloch, Director of the UFT grievance department, indicating that the union would not pursue plaintiff's appeal of his denial of completion of probation. See letter from Howard J. Bloch to plaintiff, dated October 4, 1999, Exhibit "ZZ."

171.    On or about February 16, 2000, plaintiff brought a proceeding in New York State Supreme Court, County of Kings, pursuant to New York Civil Practice Law and Rules ("CPLR"), Article 78 challenging his termination.  Plaintiff challenged the termination based on a theory of "tenure by estoppel" and sought reinstatement.  See petition in Ricardo Brenes v. Board of Education of the City of New York, Index Number 6244/2000, verified on February 16, 2000, Exhibit "AAA."

172.    On or about March 24, 2000, BOE cross-moved to dismiss the petition on the grounds that, *inter alia,* the petition was barred by the applicable four-month statute of limitation because the petition had been brought more than a year after the accrual of the cause of action.  See (a) Notice of Cross Motion to Dismiss, Affirmation of Respondents' Cross-

Motion to Dismiss the Petition, dated March 24, 2000; and (b) Memorandum of Law In Support of Respondent's Cross-Motion To Dismiss, dated March 24, 2000,  as Exhibit "BBB."

173.    On or about November 17, 2000, the Honorable William J. Garry, Justice of the Supreme Court, County of Kings, issued an Order and Judgment dismissing the petition in its entirety.   See Order, dated November 17, 2000, Exhibit "CCC"

**L.    The Instant Litigation.**

174.    Plaintiff commenced the instant action on June 8, 2001.   See Original Complaint, dated June 5, 2001, Exhibit "DDD," ¶¶ "36" – "48," "63".

175.    Defendants answered in August, 2001.   See Answer, dated August 29, 2001, Exhibit "EEE."

176.    By Decision and Order, dated November 9, 2007, the Honorable Sandra J. Feuerstein, United States District Judge, Eastern District of New York, granted defendants' motion for summary judgment and dismissed the complaint in its entirety. See Order, dated November 9, 2007, Docket Entry No. "111."

177.    On or about March 23, 2009, the Second Circuit Court of Appeals vacated the grant of summary judgment as to Principal Frank with respect to plaintiff's First Amendment retaliation claim as well as the denial of plaintiff's request for leave to amend the complaint to assert a due process claim. See Brenes v. City of New York et al., No. 07-Cv-5549, 2009 U.S. App. LEXIS 6270, (2d Cir. March 23, 2009), Exhibit "FFF."

178.    On or about May 21, 2009, plaintiff filed the First Amended Complaint asserting a First Amendment retaliation claim against Principal Frank and a due process claim against all named defendants.   See generally First Amended Complaint, dated May 21, 2009, Exhibit "A."

179.    On or about August 13, 2009, the Honorable Tucker L. Melançon, United States District Judge, Western District of Louisiana, ordered reopening discovery in this matter on the issue of plaintiff's Fourteenth Amendment, Due Process Clause claim and permitting summary judgment motions and cross-motions on the Due Process Clause claims only.  See Order, dated August 13, 2009, Docket Entry 134.

180.    On or about November 30, 2009, plaintiff filed a motion to strike three affirmative raised by the defendants in the Amended Answer to the First Amended Complaint. See, Letter Motion to Strike of Robert N. Felix, dated November 30, 2009, Docket Entry 140.

181.    On December 3, 2009, the Court issued an Order denying plaintiff's motion in its entirety. See Order, dated December 3, 2009, Docket Entry 148.


Dated:      New York, New York
            January 15, 2010


                        MICHAEL A. CARDOZO
                        Corporation Counsel of the
                          City of New York
                        Attorney for Defendants
                        100 Church Street, Room 2-314
                        New York, New York 10007-2601
                        (212) 227-3153
                        lmartine@law.nyc.gov



                    By:   ECF:              /s/
                                   Larry R. Martinez
                                   Assistant Corporation Counsel

01 CV 3943(TLM)(LB)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

RICARDO BRENES,

                                                    Plaintiff,

                    -against-

JOANNE FRANK, et al.,

                                                    Defendants.

**DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

**VOLUME I of II**

**MICHAEL A. CARDOZO**
*Corporation Counsel of the City of New York*
Attorney for Defendants
100 Church Street, Room 2-314
New York, New York 10007-2601


Of Counsel:    Larry R. Martinez
Tel No.:        (212) 227-3153

Matter No.:01GL000530

*Service of which is hereby acknowledged*:

*New York, New York*   Dated:  ..................................2010

Signed: ...............................................................................

Attorney for: ......................................................................